**PANAMA PROCESSES, S.A., Plaintiff,**

v.

**CITIES SERVICE COMPANY, Defendant.**

**No. 79 Civ. 787–CSH.**

United States District Court,
S. D. New York.

Nov. 6, 1980.
Supplemental Opinion Nov. 7, 1980.

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for plaintiff; Brian J. Gallagher, John R. Hartje, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for defendant; James C. Blair, Jeffrey N. Gordon, Alisa F. Levin, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendant Cities Service Company ("Cities") moves to dismiss the complaint of plaintiff Panama Processes, S.A. ("Panama") on the ground of forum non conveniens, and for failure to join an indispensable party as required by Rule 19, F.R.Civ.P.

The complaint contains two counts. The first sounds in contract, and the second in tort, for breach of a majority shareholder's fiduciary duty to a minority shareholder. The contract underlying the first count was the subject matter of prior litigation in this Court. *Panama Processes S.A. v. Cities Service Company*, 362 F.Supp. 735 (S.D.N.Y.1973), *aff'd* 496 F.2d 533 (2d Cir. 1974). The decision of District Judge Gurfein (as he then was) details the circumstances giving rise to the contract, a letter agreement dated September 7, 1965 between Panama and Cities' predecessor, Columbian Carbon, Inc. ("Columbian").

Familiarity with Judge Gurfein's opinion is assumed. Briefly stated, Panama exacted the letter agreement from Columbian as a condition of accepting a restructuring of a Brazilian corporation, Companhia Petroquimica Brasileira–Copebras ("Copebras"). A contemplated purchase by Copebras of its shares previously held by the Celanese Corporation of America ("Celanese") would reduce the number of Copebras shareholders from three to two, Columbian and Panama, and elevate Columbian to the status of majority shareholder. Panama was concerned about the dividend policy Columbian might thereafter adopt.

The letter agreement of September 7, 1965, addressed by Columbian to Panama and endorsed by the latter, provides in pertinent part as follows:

"In the event Columbian Carbon Company, (Columbian) attains a majority position in the stock interest of Companhia Petroquimica Brasileira (Copebras), you as a minority shareholder have expressed your concern as to the dividend policy Columbian would adopt.

"It must be recognized that future policy of this kind may be affected by the industrial, fiscal, and political situation in Brazil, and that the corporate objectives and competitive position of Copebras may change from time to time.

"It is definitely the intention of Columbian after due consideration of the above

factors to cause Copebras to declare dividends, insofar as it may legally do so, to the extent of at least 50% of each year's net income after taxes.

"Any declaration or omission of dividend will be voted only after full consultation and, if possible, agreement with all minority shareholders.

"Columbian will not cause Copebras or its subsidiaries to undertake any further expansion of its productive capacities beyond what has already been approved as of this date, unless dividends to the extent of at least 50% of each year's net income after taxes, cumulative starting with the calendar year 1964, have been paid, unless such expansion has been approved by Panama Processes and such cumulative dividends have been waived. The provision of this paragraph shall not be applicable to carbon black corporations to the extent of $1,500,000 in the event a competitive carbon black plant is not in operation by December 31, 1967.

"At such time when Celanese Corporation of America (Celanese) ceases to have representation on Copebras' Consultative Board, Panama Processes will be permitted to designate one additional individual to have representation on Copebras' Consultative Board. Further, Panama Processes shall have the right at the next stockholders' meeting of Copebras, with the approval of Celanese, to designate one additional individual to have representation on Copebras' Board of Directors.

"Columbian will not transfer its stock in Copebras unless the transferee thereof agrees to assume all the obligations of the transferor under this Agreement. The obligations of Columbian under this letter will terminate in the event Panama Processes' interest in Copebras becomes less than 15%."

Thereafter Copebras acquired the Celanese shares, Columbian became the majority stockholder, and Panama the minority stockholder. Columbian, a wholly owned subsidiary of Cities, was merged into its corporate parent in 1970.

Copebras produces carbon black, a petrochemical used in tire manufacture, and other petrochemicals. In 1973, eight years after execution of the letter agreement, Panama sued Cities in this Court. This was the case assigned to Judge Gurfein. At some time prior to January, 1973, Copebras announced its intention to borrow money under a loan agreement which, until repayment, would restrict the amount of payable dividends. Panama protested that course of action as violative of the September 7, 1965 contract. It sued for a declaratory judgment, basing jurisdiction on diversity of citizenship: in 1973 Panama, a Panamanian corporation, had it principal place of business in Geneva, Switzerland, and Cities, a Delaware corporation, had its principal executive office in New York City. Judge Gurfein summarized Panama's prayed–for relief at 362 F.Supp. at 737:

"The relief sought is for judgment 'a) declaring that the said contract dated September 8, 1965 remains in full force and effect and is binding upon the defendant in accordance with its terms; b) restraining and enjoining the defendant from in any wise breaching or failing to comply with the terms and conditions of said agreement.' There is no prayer for other and further relief."

In a letter dated February 13, 1973 to Panama, Cities had taken the position that the September 7, 1965 agreement was not binding. That assertion triggered Panama's suit for a judicial declaration that the agreement *was* binding. However, Cities' responses also included:

" . . . the expressed interpretation put forward by the defendant that it may proceed with the loan and the expansion project on the ground that Exhibit A [the letter agreement] is subject to changes in the industrial, fiscal and political situation in Brazil and to the corporate objectives and competitive position of Copebras, as well as because the contract has lapsed after a reasonable time." *Ibid.* (material in brackets supplied).

Panama did not include in its complaint any prayer that the court approve its inter-

pretation of the contract and reject that of Cities, an omission which puzzled Judge Gurfein.[1] In those circumstances, the judge exercised his discretion and dismissed Panama's declaratory judgment suit, on the ground that a declaration limited to the binding nature of the contract would not resolve the parties' disputes as to its proper interpretation. Panama could presumably have amended its complaint so as to pose a fully justiciable controversy. It did not do so, instead appealing Judge Gurfein's order of dismissal, which the Court of Appeals affirmed without opinion. 496 F.2d 533.

Panama filed the instant complaint against Cities on February 9, 1979. Its allegations of wrongdoing and prayers for relief are cast in language far more broad than the 1973 pleading. In essence, Panama alleges that, since execution of the contract and Cities' ascension to majority control of Copebras, Cities "has employed a variety of artificial and manipulative accounting devices on a selective basis to understate, and in many cases to exhaust, the reported earnings of Copebras." Panama further alleges that Cities "has caused repeated expansion of the Copebras physical plant despite Panama's lack of voluntary consent." These actions allegedly resulted in "Copebras' failure to pay cumulative dividends equal to at least fifty percent (50%) of its true economic earnings." Complaint, ¶ 20. In addition, Panama charges that Cities' "artificial and manipulative accounting has virtually destroyed the value of Panama's interest in Copebras." *Id* ¶ 22.

Such acts by Cities are alleged, in count one of the complaint, to constitute breaches of the September 7, 1965 letter agreement; and, in count two, to constitute the tortious breach of Cities' fiduciary duty, as the majority shareholder of Copebras, to Panama as minority shareholder. The monetary damages claimed under each count are stated in identical language, thus:

"[Panama] has been damaged in an amount equal to the dollar value of the cumulative dividends which it should have received (but did not receive) in each year from 1965 through 1978, adjusted for Brazilian monetary correction, and together with interest according to law. Although [Panama] does not have access to the data necessary to compute the exact figure, [Panama] believes that its damages substantially exceed $10 million."

In addition, the complaint prays for declaratory and injunctive relief, as follows:

"(b) declaring that [Cities'] imposition of artificial and manipulative accounting devices for the purpose of understating Copebras' true economic earnings and shareholders' equity is a breach of the September 7 Agreement and of [Cities'] fiduciary obligations to [Panama];

"(c) enjoining [Cities], its officers, directors, subsidiaries, successors and assigns from taking any future action to depress Copebras' true economic earnings or the true value of the shareholders' equity in Copebras and from otherwise preventing the payment of properly computed cumulative dividends; . . ."

The September 7, 1965 letter agreement was negotiated and executed in New York City. During the six–year interval between complaints, Cities moved its principal executive offices from New York to Tulsa, Oklahoma. Only a small office remains, peopled by employees not conversant with this action.

In March, 1973, Cities transferred all its stock in Copebras to Citco do Brasil, a Brazilian corporation not named as a defendant herein. The stock of Citco do Brasil is owned by Citco International Chemicals Co. and Citco Inc., both Delaware corporations and wholly–owned subsidiaries of Cities.

1.  Judge Gurfein stated:

"Curiously, no declaratory relief is sought for an *interpretation* of the obligations of the contract. . . . Why [Panama] does not ask for a declaration that it is right on these issues remains a mystery, but it does not seek such a declaration. . . . There may be unseen reasons of strategy for the restriction of the action to the relief sought -which asks for no interpretation of the contract itself. That is not the concern of the Court." *Id.* at 737, 738, 739 (emphasis in original).

With respect to Panama, the complaint alleges that it is still a Panamanian corporation, now maintaining its principal place of business in London, England. It is further alleged that Joseph Michaan, Panama's chief executive officer, is presently a New York resident, and that the corporation's pertinent files are kept in New York.

*Forum Non Conveniens*

■ Dismissal of an action on the basis of forum non conveniens rests within the discretion of the district judge. If he is wise, that discretion will be informed by the recent decisions on point in his circuit.

The most recent forum non conveniens decision in the Second Circuit is the *en banc* opinion in *Alcoa Steamship Company, Inc. v. M/V NORDIC REGENT*, No. 78–7054 (2d Cir., February 25, 1980); *cert. denied,* —— U.S. ——, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980). *Alcoa* makes it clear that whatever the source of jurisdiction, civil or admiralty, the Second Circuit looks to *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), as declaring the proper standard for dismissal of an action on the ground of forum non conveniens.

"In all cases in which the doctrine of forum non conveniens comes into play, it presupposes at least two forums in which the defendant is amenable to process; the doctrine furnishes criteria for choice between them." *Gilbert,* 330 U.S. at 506–507, 67 S.Ct. at 842. In the case at bar, Cities does not deny that it is amenable to process in this Court; it contends that this Court should decline to retain jurisdiction, and remit the parties to the courts of Brazil. As a condition to that relief, Cities expresses its willingness to submit to the jurisdiction of the Brazilian courts, thereby creating the requisite alternative forum. That is a consent to jurisdiction sufficient to lay the foundation for application of forum non conveniens. *Schertenleib v. Traum,* 589 F.2d 1156, 1159–1164 (2d Cir. 1978).

I turn, then, to the criteria declared in *Gilbert,* 330 U.S. at 508–509, quoted by the Second Circuit in *Alcoa,* slip op. at 5952 n.4:

" 'If the combination and weight of factors requisite to given results are difficult to forecast or state, those to be considered are not difficult to name. An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility [sic] of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

" 'Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.' 330 U.S. at 508–09, 67 S.Ct. at 843 (footnote omitted)."

■ Panama stresses that, when this action was commenced, its principal executive officer and shareholder, Mr. Michaan, was and remains a New York resident. This is offered as a counter to the emphasis placed by Cities upon the facts that Panama is a Panamanian corporation, with its principal place of business in London. Preliminarily it must be noted that, under present Second Circuit authority, the American citizenship of a plaintiff has no particular effect in balancing the forum non conveniens factors. In *Farmanfarmaian v. Gulf Oil Corp.*, 588 F.2d 880 (2d Cir.1978), the Iranian plaintiff had the advantage of a treaty in the United States and Iran which granted him access to American courts "on terms no less favorable than those applicable to nationals of the court's country." Thus, as the *Alcoa en banc* court observed of *Farmanfarmaian:*

> "For the purpose of the forum non conveniens motion, therefore, the courts were obliged to, and did, apply the same forum non conveniens standard as would have been applied if Farmanfarmaian were an American citizen." Slip op. at 5956.

The complaint was dismissed on the ground of forum non conveniens in *Farmanfarmaian,* as it was in *Alcoa* itself, which carried this devaluation of American citizenship to a logical conclusion by dismissing an action commenced in the Southern District of New York by a New York corporation. *Alcoa* holds that there is nothing about American citizenship of a plaintiff which "justifies creating a special rule of forum non conveniens." *Id.* at 5973. In consequence, I place to one side the debate as to whether, and to what extent, Panama is "American," and turn to the *Gilbert* factors.

Those factors may generally be divided into "private" and "public" considerations. Private considerations, summarized in the first of the two paragraphs quoted from *Gilbert, surpa,* focus upon the parties, their conveniences and inconveniences, and the relative prospects for fair and expeditious trial presented by the alternative forums. "Factors of public interest," in *Gilbert's* phrase, focus more upon the legitimate interests and concerns of the courts themselves, the communities in which they are found, and the jurors who must support their endeavors. Quite clearly, these considerations overlap: thus the Court in *Gilbert* included, in its discussion of private factors, "the enforcibility [sic] of a judgment if one is obtained"; that is also a legitimate institutional concern for the court itself, particularly where, as here, a plaintiff prays for injunctive relief which, if granted, would require the court's continuing supervision of mandated behavior.

■ To evaluate the forum non conveniens factors, it is necessary to consider in closer detail the nature of Panama's claims against Cities. The dividends payable to Panama depended upon Copebras' "officially" reported earnings in Brazilian creceiros. Panama alleges that, after Cities obtained control of Copebras through the medium of its subsidiary Columbian, it caused Copebras to depreciate that company's physical assets on an accelerated basis. Prior to this equity restructuring, Copebras' assets had been depreciated on a ten year straight–line basis, that is to say, 10% per year. It appears from documents submitted with the motion papers that Cities imposed accelerated depreciation upon Copebras in order to eliminate the latter corporation's income tax liability in certain years. Since that accounting tactic also had the effect of eliminating officially reported creceiro income, upon which dividends were based, Panama assets that: "[t]he impact of Cities–mandated accounting on Copebras' 'official creceiro earnings' and Panama's dividend income from Copebras was both major and devastating." Main brief at 24. At the same time, Panama points out, Cities has computed Copebras' net income without accelerated depreciation, for the purpose of reporting dollar earnings in the United States. Thus it is said that while Panama has been deprived of its Copebras–generated benefits, namely, dividends, Cities has "enjoyed the full benefit of Copebras' income," in the form of accrual of its share of Copebras' actual income into its reported earnings. *Id.* at 23.

In its complaint, Panama also complains of additional "artificial and manipulative accounting devices," such as treatment of pre–operational disbursements and interest charges incurred on plant expansion as current expenses. In view of the high Brazilian inflation rate, it is said that such charges often exceeded the cost of the acquired assets. Panama contends that discovery is necessary to develop information with respect to additional manipulative accounting.

On the question of plant expansion, a subject also covered by the September 7, 1965 letter agreement, Panama contends in its main brief at 26 that: "Cities has caused Copebras to constantly expand its plant and constantly depreciate that expanding plant, thus destroying dividends and Panama's rights under the September 7 agreement." Further on the issue of expansion, Panama alleges in its complaint that Cities "has caused repeated expansion of the Copebras physical plant despite Panama's lack of voluntary consent," again resulting in a failure by Copebras to pay dividends to Panama.

As noted *supra*, Panama alleges that its deprivation of income, resulting from these causes, constitutes both a breach of the September 7, 1965 agreement, and a breach of Cities' fiduciary duty as a majority shareholder of Copebras. Panama demands damages to compensate for dividends that should have been paid and were not; and declaratory and injunctive relief to ensure that such deprivations do not occur in the future.

Clearly, the reasons underlying the manner of Copebras' accounting, expansion, and dividend policies are important to the resolution of these disputes. It will be recalled that Columbian's undertakings in the September 7, 1965 letter, in respect of dividend policy and plant expansion, were preceded by the *caveat* that the parties must recognize "that future policy of this kind may be affected by the industrial, fiscal, and political situation in Brazil, and that the corporate objectives and competitive position of Copebras may change from time to time." In its present complaint, at ¶ 18, Panama

specifically alleges that during the period from 1965 through 1978, "there has been no change in the Brazilian economic, political or fiscal conditions sufficient to justify a failure to declare the cumulative dividends required by the September 7 agreement." In defending against the 1973 action before Judge Gurfein, Cities took the position that changes in the industrial, fiscal and political situation in Brazil justified the construction–loan program there in controversy; comparable assertions are made in the case at bar. Thus Cities argues in its main brief at 14 that "one of the most powerful reasons why Brazil is clearly the only proper forum for this case is that a Brazilian court, far more than any other, is qualified to judge the existence and significance of changes in the Brazilian industrial, fiscal and political situation and in Copebras' competitive position."

The parties debate the several *Gilbert* factors at length in their briefs. In my judgment, one of the most significant factors is the extent to which this Court's judgment would impact upon, and purport to control, the internal affairs of Copebras, a Brazilian corporation. Cast in Gilbertian terms, this question implicates the enforceability of the court's judgment, the degree of this community's interest in and concern for the litigation, and the difficulties this Court might have in interpreting and applying Brazilian law: all factors to which the Supreme Court referred in *Gilbert*.

Panama contends that I need not worry about these considerations, because this is a suit between non–Brazilian shareholders, both of whom are properly before this Court, turning upon American common law concepts (at least in respect of the contract cause of action), without significant effect upon a Brazilian corporation beyond the Court's jurisdiction. Primary reliance for this proposition is placed upon *Hoffman v. Goberman*, 420 F.2d 423 (3rd Cir. 1970), which is said to point the way towards retention of jurisdiction by this Court.

At first blush *Hoffman* appears to support Panama's position, but further analysis gives rise to negative implications. The

plaintiff in *Hoffman* was a resident of Baltimore, and the defendant a resident of the Eastern District of Pennsylvania, where suit was brought. These individuals were the sole owners of the capital stock of a resort hotel corporation, organized under the laws of the Netherlands Antilles. The action arose out of a contract between plaintiff and defendant, pursuant to which plaintiff transferred to defendant 52½% of the outstanding shares of the capital stock, in consideration of a payment by defendant, together with defendant's undertaking the construction of the hotel, and the arranging of its permanent financing. Plaintiff's complaint alleged that, as a consequence of actions at a subsequent shareholders' meeting, which included the issuance of the remaining authorized but unissued capital stock to defendant, the ratio of stock ownership was altered, to plaintiff's disadvantage, from 47½–52½% to a 9½–90½% ratio. These acts were said to violate the original contract between the parties. As permanent relief, the complaint sought an order requiring the defendant to surrender for cancellation the additional shares issued to him as a result of the actions complained of, and to restore the ratio of share–ownership in accordance with the contract. 420 F.2d at 424–425.

The district court granted defendant's motion to dismiss the complaint on the ground of forum non conveniens, and remitted the parties to the courts of the Netherlands Antilles. In doing so, the district court accepted defendant's submission "that this was a suit which called upon the court to interfere in the internal affairs of a foreign corporation and that it was more properly triable in the foreign court." *Id.* at 425. On appeal, the Third Circuit reversed, accepting the contrary contentions of the plaintiff, which the Court of Appeals summarized at 426:

"The plaintiff, on the other hand, contends that the relief which he is seeking is neither against nor on behalf of the corporation and that *his action does not involve the policy or management of the corporation* but that the primary basis of the relief sought is the defendant's action in changing the ratio of share ownership from that agreed upon by the parties, both of whom are properly before the district court, and that the secondary basis is the defendant's action as majority shareholder in causing the 200,000 authorized but unissued shares to be issued to himself, not to serve any bona fide corporate purpose but solely to dilute and injure the plaintiff's interest in the corporation." (emphasis added).

The *Hoffman* court, construing Pennsylvania law, acknowledged that domestic courts "do not ordinarily interfere in controversies relating merely to the internal management or policy–making of a foreign corporation," *id.* at 427, but went on to observe that "nonetheless, *if the internal affairs of a foreign corporation are only incidentally involved* in a suit the court will not refrain from exercising its jurisdiction." *Ibid.* (footnotes omitted) (emphasis added). The Third Circuit then reasoned as follows:

"Our examination of the record in this case satisfies us that *it does not involve undue interference with the internal management of a foreign corporation.* The plaintiff asserted in the district court that the defendant directed his shares to be voted as they were at the shareholders' meeting in retaliation for certain actions taken by plaintiff. At argument on this appeal the defendant's counsel stated that the evidence would show that what allegedly angered the defendant was the plaintiff's action in holding a secret meeting of shareholders on July 7, 1967 in the Netherlands Antilles at which he purported to change the bylaws of the corporation so as to require the approval of the holders of 80% of the shares for effective corporate action. It thus appears that this controversy directly involves only the two parties to this case, both of whom are properly before the district court, and that *it only collaterally involves the corporation.* It further appears that the relief sought by the plaintiff can be afforded him in the district court by a decree in personam against the defendant directing him to comply with the agreement be-

tween the parties and, as majority stockholder, to cause the corporation to take such action as may be necessary to that end. A decree against the corporation itself would, therefore, not be needed in this regard. We are, accordingly, satisfied that the court abused its discretion in dismissing the suit on the ground that the complaint asks the court to interfere in the internal affairs of a foreign corporation." *Id.* at 427–428 (emphasis added).

I interpret this language to mean that if the relief sought by plaintiff involved the internal affairs of a foreign corporation vitally, instead of "only incidentally," the result would have been different. But the court was satisfied that the controversy "directly involves" only plaintiff and defendant, "and that it only collaterally involves the corporation." That conclusion followed from two circumstances. First, the dispute between the two shareholders was confined within narrow boundaries, limited to a single incident: by obtaining the issuance of the additional shares to himself, did defendant breach the initial agreement, or did he not? That question could be resolved entirely by resort to Pennsylvania law, the place of contracting; the law of the Netherlands Antilles was in no manner involved or implicated. Secondly, plaintiff could obtain full relief by a relatively simple direction by the Eastern District of Pennsylvania, restoring the ratio of ownership to the original percentages. That relief could be accomplished without in any way impacting upon the day–to–day operations of the foreign corporation.

In both these circumstances, the case at bar differs substantially from *Hoffman.* The disputes between Panama and Cities arise directly out of the operations of Copebras. Furthermore, the parties recognized in the September 7, 1965 letter that Cities' future policy obligations in respect of dividends "may be affected by the industrial, fiscal, and political situation in Brazil," as well as changing "corporate objectives and competitive position of Copebras." The letter agreement does not undertake to further define these considerations, or to lay down ground rules for Cities' response to

them, other than providing, in the next paragraph of the letter, that the majority stockholder give "due consideration of the above factors"; but it is entirely clear that Brazilian affairs in general and Copebras' affairs in particular, inform and shape the parties' rights and obligations under the letter agreement. No such factors were present in *Hoffman.*

Perhaps more significantly, the injunctive relief requested by Panama, if granted, would involve this Court in the continued monitoring of the operations of a foreign corporation. In *Hoffman,* the injunctive relief sought was finite and limited: a restoration of the ownership ratio between two American residents. That could be accomplished without involving their foreign corporation in any meaningful sense. In the case at bar, Panama seeks an order mandating Cities to cause Copebras, a Brazilian corporation, to conduct its internal and fiscal affairs in a manner consistent with Panama's perception of the parties' obligations. In short, this action impacts directly upon the accounting practices, expansion, and dividend policies of a foreign corporation: vital operating concerns. This is not what the *Hoffman* court had in mind when it observed that the limited dispute between the shareholders "only collaterally involves the corporation."

The Second Circuit heard argument in *Schertenleib v. Traum, supra,* and *Farmanfarmaian v. Gulf Oil Corp., supra,* on the same day, and decided them within three days of each other in opinions by now Chief Judge Feinberg. In each case, the Second Circuit affirmed the district court's dismissal, on the basis of forum non conveniens, of an action involving commercial and related activities in a foreign country. I find these decisions more instructive than the even more recent *en banc* opinion in *Alcoa, supra,* which while declarative of the lack of effect deriving from plaintiff's American citizenship, has for its operative facts a single–incident injury to property (collision between defendant's vessel and plaintiff's pier in Trinidad).

In *Schertenleib,* a Swiss attorney sued a New York attorney for abuse of Swiss court process, false testimony, and defamation, all arising out of a series of commercial and legal transactions involving mutual funds. The defendant, although a New York resident, had given the testimony and taken the actions of which plaintiff complained in Switzerland; and the Second Circuit concluded that the operative facts were devoid of meaningful New York contacts. The Second Circuit further concluded that the relevant witnesses and documents were in Switzerland. Additionally, the Court observed that Swiss law governed the tort claims, which "necessitates the introduction of inevitably conflicting expert evidence on numerous questions of Swiss law, and it creates the uncertain and time–consuming task of resolving such questions by an American judge unversed in civil law tradition." 589 F.2d at 1165.[2] Finally, the Court referred to proceedings pending in Geneva involving the same factual matters at issue, which demonstrated that "these litigants already have Swiss counsel well versed in the complicated factual details of this dispute." *Ibid.*

*Farmanfarmaian, supra,* was a suit brought by an Iranian citizen and attorney against eleven American oil companies. Since, as noted *supra,* the plaintiff had by virtue of treaty the status of an American citizen, the suit for forum non conveniens purposes must be regarded as one entirely between American citizens. Plaintiff had entered into a written contract with the Iranian Investment Corporation, an Iranian subsidiary owned by the defendants and three European oil companies. Plaintiff alleged that the contract granted him an option to repurchase a one–third stock interest in Pazargard Chemical Company, an Iranian petrochemical manufacturer. Plaintiff sued for breach of that option

agreement. Upon the American defendants' expressed willingness to defend the suit in Iran, the Second Circuit affirmed the district court's dismissal of the complaint, approving the consideration which the district court gave to factors which are summarized at 588 F.2d at 881. The agreements were reached in Iran, between Iranian parties, and concerned the shares of an Iranian company. Thus, evidence of any breach of contract "must come primarily from Iran. . . ." In addition, the action of the Iranian government was material, defendants alleging that the transfer of the Pazargard shares to the government rather than to plaintiff was compelled by the government, while plaintiff alleged that the transfer was merely induced by the government. Again, the relevant proof would come primarily from Iran. Finally, the district court observed "that the validity of plaintiff's claims must be determined under Iranian and not American law," whose substantive application the district court characterized as a "difficult task" on the basis of his prior experience in the case. *Id.* Finding no facts, after an opportunity for discovery, to back up plaintiff's claim that the Southern District was a convenient forum, the district court dismissed the complaint, *id.* at 882, and the Second Circuit affirmed.

No two cases are identical. Certain factors present in *Schertenleib* and *Farmanfarmaian* which militated towards dismissal are not present in the case at bar. Thus the contract upon which the first count of the complaint depends was negotiated and executed in New York. The corporate plaintiff's principal officer is available to give evidence in New York. Although plaintiff is a Panamanian corporation, with its principal place of business in London, plaintiff asserts that its pertinent documents are here, and I have no reason to doubt the

---

**2.** In that regard, the *Schertenleib* Court, 589 F.2d at 1163 n.14, quoted Judge Friendly's observations in *Conte v. Flota Mercante del Estado,* 277 F.2d 664, 667 (2d Cir. 1960):

"[T]ry as we may to apply the foreign law as it comes to us through the lips of the experts, there is an inevitable hazard that, in those

areas, perhaps interstitial but far from inconsequential, where we have no clear guides, our labors, moulded by our own habits of mind as they necessarily must be, may produce a result whose conformity with that of the foreign court may be greater in theory than it is in fact."

assertion. As far as defendant Cities is concerned, it has at least an American presence, if not a New York one. Had Panama amended its complaint in 1973, following dismissal of the first action by Judge Gurfein, and pressed for an interpretation of the contract, it would have found Cities, its managerial witnesses, and pertinent documents present in New York. In the interim, however, Cities has moved its corporate headquarters to Tulsa, and defendant's witnesses and exhibits at trial here would have to come from there. As to controlling law, it is at least arguable, as plaintiff contends, that New York law would apply to the contract cause of action, although defendant responds that under New York conflicts principles, Brazilian law would govern questions of interpretation, breach, and duration; Cities relies upon *Auten v. Auten,* 308 N.Y. 155, 161, 124 N.E.2d 99 (1954), and other authorities collected in its main brief at 22 n.1. Of course, whatever may be the controlling law on the contract claim, it is clear that Panama's tort claim, arising from whatever fiduciary duty the majority shareholder of a Brazilian corporation owes to minority shareholders, is entirely a creation of Brazilian corporate law, governed by Brazilian law.

The parties have predictably different perceptions of the litigation's dominant character. Panama says that the case, in essence, involves disputes between American interests arising out of a New York contract governed by New York law, with the pertinent witnesses and evidence in the United States, and no significant involvement of Brazilian corporations or interests. Cities says that the case turns entirely upon events occurring and rights accruing in Brazil, that Brazilian corporate and governmental interests are vitally involved, that the pertinent witnesses and evidence are in Brazil, that Brazilian law controls, and that New York has no meaningful interest in the litigation.

Reality lies somewhere between these extremes of advocacy. Both countries are involved. Whichever forum is chosen, some evidence from foreign sources will have to be adduced. That is inherent in the structuring of the parties' relationships. Significant industrial, fiscal, political, or competitive events either do not occur, as Panama contends, or they do occur, as Cities contends, in Brazil. The occurrence or non-occurrence of Brazilian events is then evaluated by Cities, previously in New York, presently in Tulsa, and decisions affecting Copebras are made: either in bad faith, as Panama contends, or in good faith, as Cities contends. Those decisions are then implemented in Brazil, impacting directly upon the corporate operations and policies of Copebras.

Thus the controversy has three cycles: action or non-action in Brazil; reaction in New York or Tulsa; and resolution in Brazil. If the case is tried here, it is clear that even assuming the parties' contractual rights are governed by New York law, Brazilian facts and law are inextricably involved. The existence *vel non* of significant developments in the "industrial, fiscal, and political situation in Brazil," upon which Cities' obligations under the September, 1965 agreement are conditional, would require a New York jury to first comprehend and then evaluate the last 14 years of that nation's volatile economic and social history. Comparable complexities of proof arise with respect to "the corporate objectives and competitive position of Copebras" within the Brazilian economy, another circumstance upon which Cities' obligation on dividends is conditional. Proof of these underlying circumstances must come primarily from Brazil.

The third and final cycle of proof, the impact of Cities' decisions upon Copebras, also depends primarily upon Brazilian evidence. The corporate books of account are kept in Portugese, in accordance with the advice of Brazilian accountants whose practices apparently differ in certain respects from those in this country. Cities' Brazilian attorney states that "under the laws of Brazil it would be unlawful to remove the books of account of Copebras from the country." Furquim affidavit at ¶ 7. Assuming that this practical problem may be solved by the reproduction and certification

of copies, *cf.* Valente Ferreira affidavit on behalf of Panama at ¶ 27, the fact remains that a New York jury would be confronted with 14 years of corporate "sonnets from the Portugese" requiring translation. It is reasonable to assume that many documents pertinent to the first, as well as the third, cycle of proof will be in Portugese. This is a significant forum non conveniens factor: "More to the point, most of the pertinent documents relevant to the underlying dispute are in French. The expense of translation, which is potentially substantial, would be totally avoided if trial is in Geneva." *Schertenleib, supra,* 589 F.2d at 1165.

Of course, documents in English evidencing Cities' decision–making processes as majority shareholder of Copebras would presumably have to be translated into Portugese for the benefit of a Brazilian judge; and American witnesses, including Panama's Mr. Michaan, who sat on the Copebras Consultative Board and has access to at least some of those documents, would have to testify in Brazil. But it appears clear that, given the chronological, geographic, economic and social considerations which underlie the disputes between these parties, the bulk of the pertinent evidence is to be found in Brazil.

Another factor the Second Circuit regards as significant is the difficulty an American court, "unversed in civil law tradition," *id.,* has in dealing with the complexities of foreign law. Judge Friendly's foretelling of the hazards an American court encounters in attempting to "apply the foreign law as it comes to us through the lips of the experts," n.2 *supra,* is manifested by the case at bar, with its conflicting affidavits from Brazilian counsel concerning the pertinent substantive and procedural law of Brazil.[3] Thus Brazilian law is significantly implicated in this case, even assuming that Panama is right in its contention that New York law would govern the contract right of action. But Cities does not accept that proposition, arguing on the basis of its affidavits that the Brazilian courts would apply "Brazilian law in determining whether Cities properly caused Copebras to utilize accelerated depreciation and to expense interest and other similar expenses during construction." Reply brief at 15. Panama responds that, under Brazilian law as its experts perceive it, a Brazilian court would, under its choice of law rules, look to New York law, at least on the contract cause of action. Cities' rebuttal is that the Brazilian court would regard, as should this Court, the operative breach as occurring in Brazil, where Cities' decisions impacted upon Copebras, rather than in New York or Oklahoma, where the decisions were made.

I need not resolve all these choice of law and *renvoi* issues. It is sufficient to say that, on either choice of law theory, this Court would have to parse significant substantive and procedural questions of Brazilian law, with the attendant hazards articulated by Judge Friendly in *Conte, supra,* and Chief Judge Feinberg in *Schertenleib, supra.*

---

3. Thus Cities, through the vehicle of affidavits by Brazilian attorneys, makes the following arguments, based on Brazilian law:

(a) Only the directors of a Brazilian corporation, who must be residents of Brazil, have the legal power to bind the corporation. While a corporate advisory council of non–residents was possible prior to 1976, in that year the Brazilian corporation law was amended so as to require that members of such a council also had to be Brazilian residents. This is offered to counter Panama's reliance upon meetings in New York and Tulsa of Copebras' "Consultative Board," upon which Cities personnel and Michaan, among others, served.

(b) The accounts of a Brazilian corporation for a particular year are presented for approval at the mandatory annual meeting of shareholders. Once the accounts are approved, a shareholder is estopped from objecting to the accounts unless a formal objection is filed within two or three years, depending on the nature of the objection.

(c) Brazilian exchange control laws restrict the amount of dividends that could legally be paid to a foreign shareholder such as Panama, even assuming Panama prevails entirely upon the merits.

See Furquim affidavit in support of motion. While Panama's Brazilian attorneys challenge Cities' interpretations of Brazilian law, and the impact of Brazilian law upon the underlying issues, the questions which arise from the battle of experts are essentially of Brazilian law.

Another consideration, arising out of the Supreme Court's analysis in *Gilbert, supra,* is the extent to which New York interests are involved in the litigation. The question that arises is whether there is a sufficient New York nexus to require a federal court sitting in New York, and New York jurors, to expend their efforts and resources upon the resolution of these issues.

It must be recognized that New York's present contacts with this litigation are minimal. To be sure, the contract was executed in New York in 1965; and, had Panama taken advantage of its option, articulated by Judge Gurfein in 1973, and sued in this district for an interpretation of the contract, it would have been able to pursue at that time a defendant resident in New York, allegedly making command decisions in New York. However, Panama elected not to pursue such a remedy at that time. It seeks to do so now; but Cities has in the interim moved to Tulsa, bringing its pertinent documents and knowledgeable witnesses with it; and in more recent years, the meetings of the Copebras Consultative Board have involved New York to a significantly lesser degree. Panama, for its part, was and remains a Panamanian corporation, not even qualified to do business in New York, with its principal place of business having been changed from Geneva, at the time of the suit before Judge Gurfein, to London at the present time.

Of course, the Copebras interests, vitally concerned in the resolution of these disputes, are entirely resident in Brazil. Furthermore, it appears from the 1976 amendments to the Brazilian corporation law that in its definition of a controlling shareholder's responsibilities, an increased emphasis has been placed upon the corporation's "social function," within the context of the "community in which it acts"; a Brazilian corporation is now required to eschew purposes "detrimental to the national interest" or "the national economy." *See* article analyzing Articles 115, 116 and 117 of the Brazilian corporation law of 1976, submitted with the papers opposing the motion. These enactments implicate, to a significant degree, the public interest of Brazil in a

proper resolution of the ongoing commercial disputes between these parties: an interest resulting from the fact that Copebras is a Brazilian corporation, doing business exclusively within Brazil.

In these circumstances, and notwithstanding the present residence of Michaan, the chief shareholder of Panama, in New York, I conclude that New York's present interest in this litigation is peripheral, surely less significant than that of either Brazil or Oklahoma.

The *Schertenleib* court also considered it significant that "[t]hese litigants already have Swiss counsel well versed in the complicated factual details of this dispute." 589 F.2d at 1165. In the case at bar, the parties are assisted by Brazilian counsel, whose familiarity with the workings of Copebras and a number of the underlying factual considerations is revealed by the battle of affidavits on the present motion. Hamilton Abade Valente Ferreira, Esq., a Brazilian attorney upon whose affidavit Panama relies in part for propositions of Brazilian law, has been retained by Panama as its Brazilian legal adviser since 1972, and served on the Board of Directors of Copebras, as Panama's nominee, from 1972 until April 3, 1979, when the Panama interests were effectively squeezed out. Dr. Ferreira gives his perceptions of Brazilian law within the context of his personal participation in the workings of Copebras. It is apparent from the motion papers that Cities has also instructed Brazilian counsel, who have acquired detailed information of the facts and disputes.

Furthermore, it appears from the most recent exchange of affidavits and memoranda on the motion that on March 28, 1979, Panama filed in the court of Sao Paulo, Brazil, a complaint under Brazilian law against Copebras and its directors. Panama's suit seeks to compel Copebras to "register" the September 7, 1965 letter as a shareholders' agreement. Under Brazilian law, the registration of such an agreement is apparently a condition precedent to a suit by Panama, as minority shareholder, to

compel Copebras and its directors to abide by its terms. The complaint, translated from the Portugese in the latest round of motion papers, invokes Brazilian law in aid of the validity and enforceability of the September 7, 1965 letter.

Michaan says, in his supplemental affidavit commenting upon Panama's Brazilian action, that he commenced this suit only in an unsuccessful effort to forestall Copebras' disenfranchisement of Panama at the April, 1979 shareholders' meeting;[4] and to toll the running of any Brazilian statute of limitations on such rights as Panama may have under Brazilian law. It further appears, from Panama's supplemental affidavits, that Panama has directed its Brazilian counsel not to serve the complaint upon Copebras or its directors, and that judicial proceedings are not effectively commenced in Brazil until service of the complaint is made upon the defendants. In that regard, Brazilian procedure resembles our own. There is no suggestion that Panama could not obtain service of the Brazilian complaint upon Copebras and its directors tomorrow, if it wished to do so. The fact that Panama has not done so reflects its preference that the litigation go forward in New York. The pendency of Panama's Brazilian action, under the direction of Brazilian attorneys with long–standing familiarity with significant facts, clearly does not bar this previously commenced action *ipso facto.* But as *Schertenleib* teaches, these are factors which may fairly be considered in evaluating the total mix of the forum non conveniens issue.

Panama's motion papers make it clear that Panama prefers jurisdiction in this Court to obtain a common law trial by jury, together with liberal pre–trial discovery under the federal rules, which Panama avers is essential to the presentation of its case, and unavailable in Brazil. There appears to be no question that Brazil, one of the many countries in the world whose legal system is structured by a civil code, would resolve the disputes by means of different procedures. A Brazilian civil trial is "inquisitorial" rather than "adversarial," with the judge acting as fact–finder, and the presentation of proof relying heavily upon documents, although witnesses appear in court for examination by the judge. It also appears that pre–trial discovery of an opponent's documents or employees, or of third–party witnesses, is not provided for by the Brazilian Procedural Civil Code.

In *Alcoa, supra,* the Second Circuit in affirming transfer of the case from this Court to the courts of Trinidad observed that, in respect of legal remedies available in Trinidad, the plaintiff was not being remitted "to a judicial system wholly devoid of due process." Slip op. at 5971 n.16. Thus the Second Circuit, in the forum non conveniens context, is apparently prepared to accept procedural differences in the law of the proposed transferee forum, as long as those differences do not rise to the level of a complete denial of due process. In the instant case, I am not persuaded that the Brazilian civil code procedures are entirely unable to deal justly with these disputes between the majority and minority shareholders of a Brazilian corporation. While it is true that much of Panama's case depends upon actions taken and directions given by Cities in the United States, no reason appears why the basis for Panama's claims cannot be presented to a Brazilian court. The September, 1965 letter agreement may be so presented; indeed, as noted *supra,* Panama has filed an action in the Brazilian court to register and enforce the terms of that letter. Having called the September, 1965 letter to the attention of the Brazilian court, no reason appears why Panama could not establish, by documentation and testi-

---

4. At an April 3, 1979 shareholders' meeting, the majority shareholder of Copebras amended the by·laws so as to "extinguish" the Consultative Board, reduce the number of directors, and delete the appointive rights of minority shareholders. As a consequence of those actions, Panama was effectively removed from repre-

sentation on the Board of Directors, and access to management deliberations. Ferreira affidavit at "⸺ 21–22. Whether these actions constitute further breaches of the 1965 agreement, or are actionable under Brazilian corporate law, form strands in the tapestry of disputes between the parties.

mony if necessary, what Copebras' policy with respect to accounting, expansion, and dividends have been during the period in dispute. Panama could then invite the Brazilian judge to agree that no industrial, fiscal, political, or economic developments had occurred in Brazil to justify a departure by Copebras from the dividend policy articulated in the letter agreement; and that no other provision of Brazilian law operated to bar the relief sought. As noted *supra*, these are issues with which the Brazilian court is far better equipped to deal than this Court. If such a showing is made, then presumably Panama will have established a *prima facie* case under Brazilian law; and the burden will then fall upon Cities (which as a condition to granting this motion has consented to Brazilian jurisdiction) to justify its actions.

Whether or not I have forecast the progress of this case in a Brazilian court with complete accuracy, I am not prepared to conclude that Brazil cannot fairly adjudicate disputes which directly implicate its recent political and economic history, and the internal affairs of a Brazilian corporation.

In sum, upon careful consideration of the foregoing factors, I conclude that Cities has sustained its burden of establishing that the forum selected by Panama is inappropriate. The complaint will be dismissed on the basis of forum non conveniens, on condition that Cities consents to the jurisdiction of the Brazilian courts, and, consistent with that consent, contests the issues on the merits. If it should subsequently appear that Cities has failed to abide by that condition, Panama may apply for reinstatement of the action here.

*Failure to Join an Indispensable Party*

Dismissal of the complaint on the basis of forum non conveniens makes it unnecessary to decide the alternative basis urged by Cities for dismissal, namely, failure to join an indispensable party as required by Rule 19, F.R.Civ.P. However, should the Court of Appeals take a different view from my own on the forum non conveniens question, it may be appropriate to indicate my judgment on the alternative basis of dismissal.

Cities contends that Copebras and Citco do Brasil are indispensable parties, within the meaning of Rule 19(b). These parties cannot be served here; thus Cities argues for dismissal of the complaint under Rule 19(b). That Rule contemplates such a disposition, in the trial court's discretion, if persons or parties of the description contained in Rule 19(a)(1)–(2) cannot be made parties in the forum. Such persons or parties are described in Rule 19(a) as follows:

"... (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

■ If I am in error in my evaluation of the forum non conveniens factors, then I would not dismiss this action on the basis of failure to join indispensable parties. That is to say: if Panama, contrary to my own evaluation, is correct in characterizing this dispute as one between Panama and Cities, with the proper interpretation of the September, 1965 letter agreement only indirectly affecting Copebras, thus bringing this case within the rationale of *Hoffman v. Goberman*, then I agree that under the holding in *Southern Pacific Co. v. Bogert*, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1918), as well as *Hoffman* itself, Copebras is not an indispensable party. *Southern Pacific Co. v. Bogert* also teaches that Citco do Brasil, a wholly-owned subsidiary of Cities, need not be regarded as an indispensable party.

## CONCLUSION

The Clerk of the Court is directed to enter judgment dismissing the complaint on the basis of forum non conveniens.

It is So Ordered.

802

## SUPPLEMENTAL OPINION AND ORDER

Since preparation of the Court's opinion in this case, dismissing the complaint on the basis of forum non conveniens, I have considered the Second Circuit's latest authority on point, the decision in *Calavo Growers of California v. Jenerali Belgium*, 632 F.2d 963 (2d Cir. 1980).

*Calavo* indicates that additional conditions should be attached to the dismissal of the complaint. As noted in my prior opinion, Cities has indicated its willingness to accept service of process in Brazil, and the dismissal of the action was conditioned upon that consent. In addition, Cities will be required to signify its agreement to waive any statute of limitations defense that may have arisen since the commencement of the captioned action in this Court; and to pay any judgment that might be rendered against Cities in the Brazilian court. See *Calavo*, at 968.

Cities is directed to serve and file in this Court a formal consent, setting forth its agreement: (1) consenting to the jurisdiction of the Brazilian courts, and agreeing to contest Panama's claims on their merits; (2) waiving any statute of limitations defense that may have arisen since the commencement of the captioned action in this Court; and (3) agreeing to pay any judgment that may be rendered against Cities by the Brazilian courts. The agreement must be executed by an officer of Cities with the requisite authority, and the authority of that officer to execute the instrument must be evidenced or attested to in an appropriate manner. The agreement, when filed in this Court, will be endorsed as an order of this Court, and will be enforceable as such.

An agreement in conformity with the terms of this supplemental opinion is to be filed and served within sixty (60) days of the date of this supplemental opinion, failing which plaintiff may apply on notice for restoration of the case to the calendar of the undersigned.

It is So Ordered.