**PANAMA PROCESSES, S.A.,**
**Plaintiff–Appellant,**

v.

**CITIES SERVICE COMPANY,**
**Defendant–Appellee.**

No. 71598.

Supreme Court of Oklahoma.

July 17, 1990.

J. Warren Jackman, Regina K. Tetik, Pray, Walker, Jackman, Williamson & Marlar, Tulsa, and Albert I. Edelman, Willis L.M. Reese, and Hans Smit, New York City, for plaintiff-appellant.

Ronald N. Ricketts, Gable & Gotwals and Charles C. Baker, Tulsa, for defendant-appellee.

OPALA, Vice Chief Justice.

The appeal presents four issues for decision: [1] Did the district court err in recognizing a prior Brazilian declaratory judgment? [2] Does Brazilian law apply to the issue whether a majority stockholder owes a fiduciary duty to a minority stockholder? and if so [3] Does Brazil's Civil Law system recognize that majority stockholders owe a fiduciary duty to minority stockholders? and [4] Does Brazilian law permit an individual stockholder's suit against a majority stockholder for breach of a statutory duty? We answer the first, third and fourth questions in the negative and the second in the affirmative.

### THE ANATOMY OF LITIGATION

This is an appeal from summary judgment rendered for the defendant, Cities Service Company [Cities], and against the plaintiff, Panama Processes, S.A. [Panama]. The dispute involves a Brazilian corporation, Companhia Petroquimica Brasileira–Copebras [Copebras]. Before 1965 Coprebras had three shareholders: Panama, Columbian Carbon Company [Columbian] and Celanese Corporation [Celanese].[1]

---

1. The pre–1965 interest of the three shareholders in Copebras was: Cities 46%, Panama 18% and Celanese 36%.

Columbian is Cities' predecessor in interest and a wholly owned subsidiary of Cities. Celanese advised Panama and Columbian in 1965 that it wanted to sell its Copebras stock. To accomplish this purpose Panama and Cities agreed that Copebras would redeem the Celanese-owned stock and retire its interest. This redemption effectively reduced the number of shareholders from three to two, with Cities owning 70% and Panama 30% of Copebras stock. As a precondition to the transaction, Panama wanted Cities to provide certain assurances concerning Copebras' future dividend, expansion and board representation policies. Negotiations then occurred in New York between Panama's representative and Cities' counsel, which resulted in a September 7, 1965 letter of agreement outlining these assurances.[2] The day after the letter was signed, Panama executed an agreement for the purchase and retirement of the Celanese-owned shares in Copebras.

## Prior New York Federal Litigation

In 1973, after Copebras announced its intention to enter into transactions that would restrict dividend payments and after Cities advised Panama that it no longer considered the 1965 letter binding, Panama sued Cities in federal court,[3] seeking a declaratory judgment that the letter was a binding contract. The claim was dismissed because the relief Panama sought was inconclusive.[4]

Six years later Panama again sued Cities in federal court, alleging breach of the letter agreement and of a fiduciary duty owed by a majority to a minority sharehold-

**2.** The September 7, 1965 letter from Columbian Carbon Company to Panama Processes, S.A., states as follows:

"Gentlemen:

In the event Columbian Carbon Company, (Columbian) [Cities' predecessor in interest] attains a majority position in the stock interest of Companhia Petroquimica Brasileria (Copebras), you as a minority shareholder have expressed your concern as to the dividend policy Columbian would adopt.

It must be recognized that future policy of this kind may be affected by the industrial, fiscal, and political situation in Brazil, and *that the corporate objectives and competitive position of Copebras may change from time to time.*

It is definitely the intention of Columbian after due consideration of the above factors to cause Copebras to declare dividends, insofar as it may legally do so, to the extent of at least 50% of each year's net income after taxes.

Any declaration or omission of dividend will be voted only after full consultation and, if possible, agreement with all minority shareholders.

Columbian will not cause Copebras or its subsidiaries to undertake any further expansion of its productive capacities beyond what has already been approved as of this date, unless dividends to the extent of at least 50% of each year's net income after taxes, cumulative starting with the calendar year 1964, have been paid, unless such expansion has been approved by Panama Processes and such cumulative dividends have been waived. The provision of this paragraph shall not be applicable to carbon black operations to the extent of $1,500,000 in the event a competitive carbon black plant is not in operation by December 31, 1967.

At such time when Celanese Corporation of America (Celanese) ceases to have representation on Copebras' Consultative Board, Panama Processes will be permitted to designate one additional individual to have representation on Copebras' Consultative Board. Further, Panama Processes shall have the right at the next stockholders' meeting of Copebras, with the approval of Celanese, to designate one additional individual to have representation on Copebras' Board of Directors.

Columbian will not transfer its stock in Copebras unless the transferee thereof agrees to assume all the obligations of the transferor under this agreement. The obligations of Columbian under this letter will terminate in the event Panama Processes' interest in Copebras becomes less than 15%.

If the foregoing correctly states Panama Processes' understanding concerning the matters covered herein, it is requested that Panama Processes indicate its acceptance hereof and agreement hereto by executing this letter in the space provided below.

Very truly yours,
WITNESS: COLUMBIAN CARBON COMPANY
_____ By_____
 Executive Vice President

ACCEPTED and AGREED TO:
This 8th day of September, 1965.
WITNESS: PANAMA PROCESSES, S.A.
_____ By_____"

**3.** *Panama Processes, S.A. v. Cities Service Co.,* 362 F.Supp. 735 [S.D.N.Y.1973], affirmed 496 F.2d 533 [2nd Cir.1974].

**4.** *Panama Processes, S.A. v. Cities Service Co., supra* note 3.

er.[5] The court dismissed the suit on grounds of *forum non conveniens* upon Cities' consent to accept service of process in Brazil and to contest Panama's claims on the merits.[6]

### The Present State and Concurrent Brazilian Litigation

Panama commenced this action against Cities in 1981 on two theories of liability—breach of contract[7] and breach of fiduciary duty[8]—in the District Court, Tulsa County. The trial court in 1982 denied Cities' motion to dismiss on grounds of *forum non conve-*

*niens.*[9] Cities then unsuccessfully sought on the same grounds a writ of prohibition in the Oklahoma Supreme Court.[10] In 1983, while the Oklahoma action was still pending, Cities, along with Copebras and three wholly-owned Cities subsidiary companies, filed a declaratory judgment action in Brazil against Panama and its Brazilian subsidiary.[11] The Brazilian trial court held itself competent over Panama's objections that (a) the place of performance of the 1965 letter was to be Oklahoma and (b) an action was pending in an Oklahoma court concerning the same letter.[12] The Brazil-

5. *Panama Processes, S.A. v. Cities Service Co.,* 500 F.Supp. 787 [S.D.N.Y.1980], affirmed 650 F.2d 408 [2nd Cir.1981].

6. *Panama Processes, S.A. v. Cities Service Co.,* supra note 5, 500 F.Supp. at 801–802. The court's "supplemental opinion and order" directed Cities to file a formal consent by which it agrees (1) to the jurisdiction of Brazilian courts and to contest Panama's claims on their merits, as well as (2) to waive any statute of limitations defense that may have arisen since the commencement of the second action, and (3) to pay any judgment that might be rendered against it by the Brazilian courts. *Panama Processes, S.A. v. Cities Service Co., supra* note 5, 500 F.Supp. at 802.

7. Panama asserts that Cities breached its contractual and fiduciary obligations by causing Copebras to adopt financial and accounting procedures, practices and policies that (a) deprived Panama of its distributive share of the true earnings and economic benefits of Copebras, (b) deprived it of the economic and market value of its mineral interest and (c) imposed plant expansions in lieu of dividend distribution. This was done, Panama states, by the employment of manipulative financial policies and accounting procedures to understate or exhaust Copebras' earnings as reported on Copebras' books and its accounting records maintained in Brazil. Panama argues that Cities' consolidated financial statements, issued in the United States each year for Cities' shareholders information and for the Securities and Exchange Commission filing, included substantially higher earnings for Copebras, calculated without the use of such manipulative financial and accounting devices.

8. Panama initially alleged that Cities' conduct was a deliberate breach of its fiduciary duties and obligations—*qua* the majority and controlling stockholder—to Panama as a minority stockholder. Its petition was amended in 1986 to allege that Cities, as a controlling shareholder, also violated its duty under the Brazil Corporation Law to act fairly and in good faith toward Panama as a minority shareholder. Panama sought damages of $75,000,000 from the

diminution of the economic and market value of its minority share ownership in Copebras. Damages of $16,000,000 were also sought for Panama's deprivation of the aggregate cumulative dividend distribution which was withheld during the years at issue. Panama also sought punitive damages in the amount of $15,000,000.

9. The predecessor trial judge made several prejudgment rulings prior to the successor judge rendering summary judgment for Cities, e.g., (a) March 3, 1982 order denying Cities' Motion to Dismiss on the grounds of *forum non conveniens;* (b) June 29, 1982 order overruling Cities' Motion to Stay Proceeding pending outcome of the Brazilian action; (c) May 19, 1983 order overruling Cities' special and general demurrers to the two theories of recovery.

10. Panama attaches some legal effect to this court's refusal to assume jurisdiction in *Cities Service Company v. The Honorable Clifford Hopper,* No. 58,227, filed March 9, 1982. Denial of relief sought under the rubric of (Art. 7, § 4, Okl. Const.) original cognizance does not constitute an adjudication on the merits of any issue raised in the writ. *Lowrance v. Patton,* Okl., 710 P.2d 108, 110 [1985]; *McGaha v. Board of Regents of Univ. of Okl.,* Okl., 691 P.2d 895, 896 [1984]; *Lemons v. Lemons,* Okl., 238 P.2d 790, 794 [1951].

11. The five plaintiffs in the Brazilian lawsuit were: Coprebras, Cities, Citco do Brasil Industria e Comercio Ltda, Columbian International Chemicals Company and Columbian Chemicals Company. The defendants were: Panama and Citrobras Industria e Comercio de Produtos Quimicos Ltda.

12. Panama filed preliminary objections prior to responding to the declaratory judgment action on its merits, asserting that the courts of Brazil had no subject matter jurisdiction of the controversy and that the plaintiffs had no legal standing to bring the action. The Fifth Civil Court of the District and State of Sao Paulo denied these

ian court rendered judgment for the plaintiffs in 1984, holding that the letter was unenforceable.[13] The appellate court affirmed this decision.[14]

Cities then moved for partial summary adjudication in the Tulsa trial court on the breach of contract theory, asserting that the Brazilian judgment should be recognized and enforced and that the res judicata doctrine bars relitigation of Panama's breach of contract theory, which had been fully and fairly litigated in the Brazilian court. On January 18, 1988 the district court sustained Cities' motion on the basis of comity. The following July it gave summary judgment to Cities on both of Panama's theories of liability. The decision on the status-based prong of the dispute was rested on several grounds (1) Brazilian law applies to this issue; (2) neither Brazilian Corporation Law [Code] nor any other Bra-

zilian law creates a fiduciary obligation of majority to minority shareholders; (3) any recovery for abuse of majority shareholder power must be sought under Article 246 and in accordance with Articles 116 and 117 of the Brazilian Corporation Law; [15] and (4) an action pursuant to these provisions is derivative, thus a shareholder has no individual cause of action under Brazil's Corporation Law for damages suffered by it as a shareholder.

## I

## THE BRAZILIAN JUDGMENT IS ENTITLED TO RECOGNITION

The full faith and credit clause of the United States Constitution[16] does not extend to foreign nation judgments, but state courts have the power to recognize them.[17]

preliminary objections, and the Brazilian appellate court affirmed that decision.

13. The Brazilian trial court based its decision on the following grounds: (1) the purposes of the 1965 letter agreement were illegal under Brazilian law in that it required dividend payment of a certain percentage of profits and of cumulative dividends to a holder of common stock, and in that it contravened Copebras' interests; (2) changes in Brazil's fiscal and political situation occurring after the signing of the letter caused the letter to lapse under its own terms and (3) even assuming the 1965 letter agreement were valid and had not lapsed, since it was for an indeterminate term it could be, and was, effectively terminated by Cities' 1973 letter.

14. Panama appealed from the declaratory judgment. A Brazilian appellate panel initially reversed the lower court on grounds that a decision on the merits of the letter's validity and enforceability should not be decided by declaratory judgment, but by litigation of specific events. Cities then requested *en banc reconsideration* of the panel's reversal. The full appellate court reversed the panel and affirmed the trial court. Panama's request for an "extraordinary appeal" to the Brazilian Federal Supreme Court was denied.

15. See *infra* note 78 for the pertinent terms of Articles 116, 117 and 246 of Brazilian Corporation Law.

16. Art. 4, § 1, U.S. Const.

17. Federal and state courts have based recognition of foreign nation judgments on various theories:
A) *Comity*

*Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 [1895], is the most frequently cited case in support of the recognition of foreign judgments. There, the Court set out the common-law principle of comity:
"[Comity] is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." 159 U.S. at 163–164, 16 S.Ct. at 143.
The Court further stated that:
". . . [W]here there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact." 159 U.S. at 202, 203, 16 S.Ct. at 158.
B) *Reciprocity*
Since France did not at that time grant recognition to United States judgments, the principle of reciprocity led the Court in *Hilton* to deny recognition to the contested French judgment. This principle has, since *Hilton,*

The present trend in the United States clearly favors recognition of foreign nation judgments.[18] Strong policies support recognition,[19] such as the protection of party expectations, prevention of harassment of one party by the other, conservation of judicial resources and promotion of consistency and uniformity of law.[20]

This trend parallels the Restatement (Second) of Conflict of Laws § 98, which states that

"[a] valid judgment[21] rendered in a foreign nation after a fair trial in a contested proceeding will be recognized in the United States so far as the immediate parties and the underlying cause of action are concerned."

## A

## THE PUBLIC POLICY DEFENSE

Panama argues that the Oklahoma court's assertion of jurisdiction over this case precluded the Brazilian court from simultaneously hearing the declaratory judgment action. It further asserts that

been subject to a great deal of criticism and has declined in use. See, e.g., *Bata v. Bata,* 163 A.2d 493 [Del.1960], *cert. den.* 366 U.S. 964, 81 S.Ct. 1926, 6 L.Ed.2d 1255 [1961], where the court held that reciprocity is inapplicable when enforcement is sought against a non-United States party; see also *Johnston v. Compagnie Generale Transatlantique,* 242 N.Y. 381, 152 N.E. 121 [1926]; *Cowans v. Ticonderoga Pulp & Paper Co.,* 219 App.Div. 120, 219 N.Y.S. 284 [3d Dep't 1927], *aff'd* 246 N.Y. 603, 159 N.E. 669 [1927]. The *Johnston* and *Cowans* decisions indicate that New York has rejected the doctrine of reciprocity; see generally, Smit, "International Res Judicata and Collateral Estoppel in the United States," 9 UCLA L.Rev. 44, 49–50 [1962].
It is not argued here that Brazil refuses to give recognition to judicial acts of the United States, and we do not express an opinion whether we would decline recognition to Brazil on the basis of its refusal to reciprocate.
C) *Principle of Obligation*
In post-*Hilton* decisions, state courts have employed theories other than comity to enforce judgments, such as the *principle of obligation* which originated in England. The gist of this theory is that "a foreign judgment creates an obligation that the local courts will enforce as any other obligation created under foreign law." Smit, *supra* at 54–55. New York has endorsed this theory in *Johnston v. Compagnie Generale Transatlantique, supra,* and in *Cowans v. Ticonderoga Pulp & Paper Co., supra.* A court applying this theory "does not, without more, accept and enforce the obligation created by the foreign judgment, but tests the foreign court's jurisdiction by its *own* jurisdictional standards and subjects the foreign judgment to additional, local law defenses such as fraud, violation of local public policy, and the like." Scoles and Hay, Conflict of Laws, § 24.3 at 922, n. 4 [1982].
D) *Res Judicata*
Another theory endorsed by some American jurisdictions is that of *res judicata.* Smit, *supra* at 56. Underlying this principle, as applied in an international setting, are essentially the same policies as those supporting it

in domestic cases, e.g., putting an end to litigation, conserving judicial resources, obtaining stability and certainty in the international realm, and protecting litigants from harassment. Res judicata effect is usually allowed by American courts to foreign-nation judgments meeting the requirements of both a valid judgment and of the res judicata doctrine. See Bishop and Burnette, *infra* note 18 at 440.

18. See generally, Leflar, McDougal and Felix, American Conflicts Law 249–253 [4th ed. 1986]; Scoles and Hay, *supra* note 17 at 916–925; Bishop and Burnette, United States Practice Concerning the Recognition of Foreign Judgments, 16 Int'l Law. 425–442 [1982]; Ginsburg, Recognition and Enforcement of Foreign Civil Judgments: A Summary View of the Situation in the United States, 4 Int'l Law. 720–740 [1970]; A. Ehrenzweig, A Treatise on the Conflict of Laws, §§ 45 and 46, pgs. 160–166 [1962].

19. See *supra* note 18.

20. *See* Scoles and Hay, *supra* note 17, § 24.1 at 916.

21. See § 92 of the Restatement (Second) of Conflict of Laws which lists four criteria that must be met for a judgment to be valid:
"(a) the *state* in which it is rendered *has jurisdiction* to act judicially in the case; and (b) a reasonable *method of notification* is employed and a reasonable *opportunity to be heard* is afforded to persons affected; and (c) the judgment is rendered by a *competent court;* and (d) there is *compliance* with such requirements of the state of rendition as are *necessary for the valid exercise of power* by the court." (Emphasis added.)
The Oklahoma legislature has adopted the Uniform Foreign Judgments Recognition Act, 12 O.S.1981 §§ 710 *et seq.* Although the act does not apply here because the Brazilian judgment was not one "granting or denying recovery of a sum of money" (§ 710(2)), § 716 provides that "this act does not prevent the recognition of a

the May 19, 1983 denial of Cities' general and special demurrers to its two theories of recovery is a final adjudication of the enforceability and validity of the 1965 agreement and operates to bar relitigation of that issue by the trial court. Recognizing the Brazilian judgment under these circumstances, Panama argues, would violate the public policy of Oklahoma.

■ A foreign-country judgment may be denied recognition when it is contrary to the crucial public policies of the forum in which enforcement is requested.[22] This rule concedes that a state is not required to give effect to foreign judicial proceedings grounded on policies which do violence to its own fundamental interests. In the Restatement (Second) of Conflict of Laws, Comment c, the drafters explain that the original claim must not be "repugnant to

the fundamental notions of what is decent and just in the State where enforcement is sought."[23] The standard for refusing to enforce judgments on public policy grounds is narrow in scope; the present trend has been to recognize this defense only in exceptional cases.[24] We find no basis here for invoking a public policy defense to preclude recognition of the Brazilian judgment.

■ Under the doctrine of res judicata,[25] only terminal judicial rulings—whether they be judgments or postjudgment dispositions—are given preclusive effect.[26] A prejudgment order that overrules or sustains a demurrer to a pleading under the pre–1984 Oklahoma pleading regime does not bear the attributes of a complete and final disposition entitled to res judicata effect.[27]

---

foreign judgment in situations not covered by this act."

**22.** See *Tahan v. Hodgson*, 662 F.2d 862, 866 [D.C.Cir.1981]; *Sangiovanni Hernandez v. Dominicana de Aviacion*, 556 F.2d 611, 614 [1st Cir. 1977]; *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 318 F.Supp. 161, 168 [E.D.Pa.1970], aff'd 453 F.2d 435 [3rd Cir.1971]; see also, A. Ehrenzweig, *supra* note 18, § 56(b) at 202; Bishop and Burnette, *supra* note 18 at 436–437. The Restatement (Second) of Conflict of Laws § 117, Comment c [1971], also recognizes the public policy defense:
 "Judgments rendered in foreign nations are not entitled to the protection of full faith and credit. A State of the United States is therefore free to refuse enforcement to such a judgment on the ground that the original claim on which the judgment is based is *contrary to its public policy.*" (Emphasis added.)

**23.** Restatement (Second) of Conflict of Laws, § 117, Comment c, *supra* note 22; see also A. Ehrenzweig, *supra* note 18, § 56(b) at 202, quoting from H. Goodrich, Conflict of Laws § 125 [1949]; Reese, The Status in This Country of Judgments Rendered Abroad, 50 Colum.L.Rev. 783, 796–798 [1950].

**24.** Scoles and Hay, *supra* note 17, § 24.44 at 980.
 While United States courts generally declare that comity does not require them to recognize a foreign judgment that contravenes public policy, they normally will not deny recognition merely because the law or practice of the foreign country differs from that of the recognition forum. *Gutierrez v. Collins*, 583 S.W.2d 312, 322 [Tex.1979]; *Hunt v. BP Exploration Co. (Libya) Ltd.*, 492 F.Supp. 885, 900 [N.D.Texas 1980];

*Toronto–Dominion Bank v. Hall*, 367 F.Supp. 1009, 1016 [E.D.Ark.1973].

**25.** See *Veiser v. Armstrong*, Okl., 688 P.2d 796, 799–800, n. 7–9 [1984].

**26.** *Allen v. McCurry, infra* note 27, 449 U.S. at 94, 101 S.Ct. at 414; *Depuy v. Hoeme, infra* note 27 at 1343; *Veiser v. Armstrong, supra* note 25; *Bruce v. Miller*, Okl., 360 P.2d 508, 512 [1961].

**27.** *Merchants Delivery Service v. Joe Esco Tire Co.*, Okl., 497 P.2d 766, 767 [1972]; *Hubbard v. Board of Trustees of the Police Pension*, Okl., 322 P.2d 207 [1958]; *Western Auto Store v. Auto Parts & Equipment Co.*, Okl., 259 P.2d 535 [1953].

Panama invokes interchangeably the principles of res judicata, collateral estoppel and law of the case in support of its argument that the May 19th order overruling Cities' general demurrer is a final adjudication of the validity and enforceability of the letter agreement under New York law and operates as a bar to further relitigation of that issue in this lawsuit. None of these doctrines is invocable here to give preclusive effect to this prejudgment order.
 [A] The *"settled-law-of-the-case"* doctrine operates to bar relitigation of issues that have been settled by an earlier appellate opinion in that case. *Mobbs v. City of Lehigh*, Okl., 655 P.2d 547, 549 n. 5 [1982]; *Mullins v. Ward*, Okl., 712 P.2d 55, 61 [1985]; *Timmons v. Royal Globe Inc. Co.*, Okl., 713 P.2d 589, 592 [1985]; *Reeves v. Agee*, Okl., 769 P.2d 745, 756 n. 46 [1989].
 [B] Under *res judicata* (claim preclusion), a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised

■ The principle of concurrent jurisdiction applies here. Where a similar controversy between the same parties is pending in separate jurisdictions, each forum is generally free to proceed to a judgment. The first final judgment would be res judicata as to issues that were or could have been raised in that action.[28] The important principles of comity compel deference and mutual respect for concurrent foreign proceedings.[29] Because the Brazilian court's final judgment was the first to be rendered, it is conclusive as to the underlying cause of action and will be accorded res judicata effect.

■ Panama asserts that the Brazilian judgment dealt with Brazilian activities and entities that were parties neither to the 1965 letter nor to the Oklahoma litigation. This argument attempts to separate the facts of the two proceedings when they are inextricably entwined. It is immaterial that there were more parties in the Brazilian litigation than in the present action.[30] Res judicata applies to bar relitigation of Panama's claim because both proceedings arise out of the same set of events and the same parties in the Oklahoma litigation were also parties in the Brazilian lawsuit.

Even if the Brazilian court had misperceived the choice-of-law doctrine, that would not create an infirmity in the court's power. The Brazilian judgment cannot be made vulnerable for legal error in the application of law; it is assailable, if at all, only for a defect in jurisdiction.[31]

---

28. In *Gutensohn v. McGuirt,* 194 Okl. 64, 147 P.2d 777, 784 [1944], the court, quoting from 2 Freeman on Judgments, § 719, stated:

*in that action. Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 [1980]; *Mobbs v. City of Lehigh, supra* at 549 n. 5; *Veiser v. Armstrong, supra* note 25 at 800 n. 8 and 9; *Depuy v. Hoeme,* Okl., 775 P.2d 1339, 1343 n. 22 [1989]. A judgment acquires the degree of finality requisite for the application of this doctrine after the expiration of appeal time when no appeal has been taken. *Depuy, supra,* at 1343 n. 23. The attribute borne by a "final order" stands in marked contrast to a *prejudgment order;* the latter always remains subject to the trial judge's change before judgment is pronounced in the case. *Depuy, supra* at 1344. Because the trial judge retains full control over all temporary orders in a case and over the manner of their enforcement, none is entitled to res judicata effect. Interlocutory orders made in the course of an action or proceeding—such as the May 19 order—are not binding on the trial court when final adjudication of the controversy is crafted. *Merchants Delivery Service v. Joe Esco Tire Co., supra; Hubbard v. Board of Trustees of the Police Pension, supra; Western Auto Store v. Auto Parts & Equipment Co., supra;* see also *Johnson v. Johnson,* Okl., 674 P.2d 539, 543 [1983] (predecree orders in a divorce case are always subject to the judge's power to extinguish or modify).
[C] Under the doctrine of *collateral estoppel* (issue preclusion), once a court has decided an issue of fact or law necessary to its judgment, that issue may not be relitigated between the same parties or their privies *in a suit upon a different cause of action. Allen, supra* 449 U.S. at 96, 101 S.Ct. at 415–416; *Veiser v. Armstrong, supra* note 25 at 799–800 n. 7 and 9; see also *Underside v. Lathrop,* Okl., 645 P.2d 514, 516–517 [1982].

"Where two actions involving the same issue or issues, between the same parties or their privies, are pending at the same time, so that a final judgment in one would be res judicata or a bar in the other, when the judgment in one becomes final it may be urged in the other by appropriate proceedings, regardless of which action was begun first. It is the first final judgment, although it may be in the second suit, that renders the matter res judicata in the other suit."
See *Hixon v. Cook,* 379 P.2d 677, 684 [1962] (*Gutensohn* rule stated but case decided on other grounds); see also *Wright Machine Corp. v. Seaman–Andwell Corp.,* 364 Mass. 683, 307 N.E.2d 826, 831 [1974].

29. *Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am.,* 651 F.2d 877, 887 [3rd Cir.1981], aff'd on other grounds, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 [1982]; see also *Kline v. Burke Const. Co.,* 260 U.S. 226, 233, 43 S.Ct. 79, 82, 67 L.Ed. 226 [1922]; *Atlantic Coast Line R. Co. v. Brotherhood of Loc. Eng.,* 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 [1970].

30. See *Corliss v. Davidson & Case Lumber Co.,* 183 Okl. 618, 84 P.2d 7, 9 [1938]; *McKee v. Producers' & Refiners' Corporation,* 170 Okl. 559, 41 P.2d 466 [1935].

31. See Restatement (Second) of the Conflict of Laws § 98, Comment c. There the drafters stated:
"A foreign nation judgment will not be recognized in the United States unless the American court is convinced that the foreign court had jurisdiction and that 'there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurispru-

## B

## THE INDEPENDENT ACTION ARGUMENT

█ Panama asserts that the Oklahoma and Brazilian actions are entirely independent, and that the Brazilian court acknowledged this independence as a basis for its exercise of concurrent jurisdiction. In support of this argument, Panama refers us to a statement in the Sao Paulo Court of Appeals' opinion on review of certain preliminary trial court rulings. There, the Brazilian court said "the Oklahoma action 'interferes in no way with the jurisdiction of Brazilian courts.'"[32] We do not interpret this statement by the Brazilian court to mean that the parties and occurrences involved in the proceedings are not the same. Rather, it is merely a recognition of the principle of concurrent jurisdiction.[33]

Panama also asserts that we should not give greater recognition to the declaratory judgment than the Brazilian court would itself give it. We are directed to other portions of the same Sao Paulo Court of Appeals opinion which, Panama urges, is a determination that the Brazilian action would have no effect on the Oklahoma proceedings:

> "[The Oklahoma action was brought] for indemnification and the action brought here [Brazil] is merely declaratory.... And, in truth, both actions may even be considered valid, with the appellant receiving the benefit of an indemnity based on that shareholders' agreement, as it requested of the United States Courts, and the appellees being favored by a

decision from the Brazilian Courts to the effect that said agreement is ineffective and inoperative with regard to Copebras S.A."

These statements by the Brazilian appellate court, on review of certain prejudgment rulings in the declaratory judgment action, do not amount to settled law of the case in the Anglo–American sense; neither does Panama support this argument by citation to any Brazilian case law which would give it that effect. It is, at best, a discussion of possible future development in this dual litigation rather than settled law of the case on a legal effect of the Brazilian adjudication.

## C

## THE DUE PROCESS ARGUMENT

█ Panama also attacks the Brazilian legal system on due process grounds. Our attention is directed to certain "due process deficiencies" in the "judicial process and procedures" of the Brazilian courts which operate as a defense against recognition of a foreign nation judgment.[34] Panama asserts that in Brazil: (1) no witnesses of any party may be subpoenaed, (2) testimony of corporate employees is inadmissible, (3) there is no available process for requiring testimony of indispensable U.S. witnesses; (4) there is no right of cross-examination, and (5) the parties may neither conduct pre-trial discovery nor subpoena documents. Panama does not contend that it failed to receive full and fair notice or that

dence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting, or fraud in procuring the judgment....' Hilton v. Guyot, 159 U.S. 113, 202 (1895). *If these conditions are met, the judgment will not be refused recognition on the ground that the rendering court made an error of law or of fact."* (Emphasis added.) See *Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624, 631 [2nd Cir.1976]; see also Restatement (Second) of Conflict of Laws § 117, Comment c, *supra* note 22; Bishop and Burnette, *supra* note 18 at 437, where the authors observe that the rule that a foreign nation judgment cannot be

attacked because the rendering court made a mistake of law or fact still prevails today.

**32.** See the Sao Paulo Court of Appeals' November 13, 1983 decision affirming the trial court's prejudgment denial of Panama's preliminary objections.

**33.** See concurrent jurisdiction discussion in Part I(A) *supra.*

**34.** Due process has occasionally been invoked to prevent a state from giving recognition to a judgment of a foreign country whose jurisdictional rules were held contrary to American conceptions. See A. Ehrenzweig, *supra* note 18, § 46 at 164 and § 55(b) at 201; Ginsburg, *supra* note 18 at 727, Restatement (Second) of Conflict

it was not given the opportunity to be heard in the Brazilian court.

This argument, rather than having its basis in a denial of due process, actually rests on the procedural differences between United States and Brazilian courts.[35] Although Brazilian norms of procedure differ from ours, that is not a basis for their condemnation as falling short of the minimum due process standards in the Anglo–American sense.[36]

## D

## LIMITED EFFECT OF THE BRAZILIAN JUDGMENT

Panama argues that the Brazilian court did not determine the effect of the contract in the United States as between Panama and Cities. Rather, Panama asserts, the judgment adjudicated only the agreement's invalidity and unenforceability in Brazil.

This argument is now moot in light of our conclusion in Part II, *infra*, that Oklahoma's choice-of-law rules governing contract issues point to application of Brazilian law on the contract prong of this controversy.

■

## JUDICIAL ESTOPPEL

■■■ Panama asserts that Cities is judicially estopped from arguing on appeal that Brazilian law applies to the contract prong of the controversy.[37] This is so, Panama urges, because Cities had earlier conceded in its general demurrer, as well as in its application for a writ of prohibition in this court,[38] that New York law governs the construction and validity of the letter agreement.[39]

This argument was not pressed below and cannot be asserted for the first time on appeal.[40] Even if it were properly before us, the judicial estoppel doctrine could not be invoked as a bar to Cities' defense. While Oklahoma jurisprudence recognizes this form of preclusion bar,[41] it is applied only to prevent advancement of inconsistent positions *vis-a-vis matters of fact*. It does not prevent a party from asserting a *legal theory* contrary to one advanced earlier in litigation.[42] Consequently, a change of position with respect to a pure matter of law ordinarily will not work an estoppel, particularly where the party was unsuccessful in pressing its earlier contrary posi-

of Laws § 98, Comment c, quoting from *Hilton v. Guyot, supra* note 17.

**35.** Panama made a general appearance in the Brazilian court, thus waiving any defense it may have asserted for lack of notice.

**36.** Foreign-law notions are not per se disharmonious with due process by reason of their divergence from the common-law notions of procedure. This concept began with *Hurtado v. State of California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 [1884]. American courts have been signally reluctant to deny recognition to foreign judgments by virtue of mere difference of procedure. *Hilton v. Guyot, supra* note 17; see also *Tahan v. Hodgson, supra* note 22 at 866; A. Ehrenzweig, *supra* note 18 at 201; Reese, The Status in This Country of Judgments Rendered Abroad, 50 Colum.L.Rev. 783, 795 n. 65 [1950].

**37.** Cities' argument that Brazilian law governs the contract prong of the dispute is not a new one. It was first asserted below when Cities unsuccessfully sought dismissal of the action on *forum non conveniens* grounds.

**38.** Cities' application in this court for a writ of prohibition (*supra* note 10) urged that either

New York or Brazilian law may govern the contract prong of the dispute.

**39.** Panama asserts, as a critical element of its judicial estoppel argument, that the May 19th order is a final adjudication of the validity and enforceability of the letter agreement under New York law, based on the "mutual submissions" of both parties. An order overruling a demurrer is not a terminal order that can be accorded the legal effect sought here. See *supra* note 27.

**40.** *Kepler v. Strain*, Okl., 579 P.2d 191, 193 [1978]; *Midwest City v. Eckroat*, Okl., 387 P.2d 123, 129 [1963]; *Edwards v. Pierce*, Okl., 376 P.2d 269, 272–273 [1962].

**41.** *Messler v. Simmons Gun Specialities, Inc.*, Okl., 687 P.2d 121, 128 [1984].

**42.** *Kansas City v. Martin*, 391 S.W.2d 608, 616 [Mo.1965]; *Tenneco Chemicals v. Williams T. Burnett & Co.*, 691 F.2d 658, 664 [4th Cir.1983]; see also Note, 59 Harvard L.Rev. 1132, 1136 [1946]; Judicial Estoppel: The Refurbishing of a Judicial Shield, 55 George Washington L.Rev. 409, 411 n. 11 [1987].

tion.[43]

We hold that the trial court did not err in extending recognition to the Brazilian declaratory judgment.[44]

## II

## BRAZILIAN LAW IS APPLICABLE TO PANAMA'S BREACH OF CONTRACT AND FIDUCIARY DUTY THEORIES

### A

### THE CHOICE–OF–LAW RULES GOVERNING THE 1965 AGREEMENT

■ Panama argues that a contract is governed by the laws of the state where the contract was "entered into" unless contrary to the law or public policy of the state where enforcement is attempted.[45] Accordingly, Panama would have us apply United States law to the 1965 agreement. Panama also urges that the Restatement's "most significant relationship" test applies to the 1965 agreement and that the various elements of this test point to application of either New York or Oklahoma law.[46]

### 1. Place of Performance

In Oklahoma jurisprudence several choice-of-law rules have been applied in determining which state's or country's laws govern the questions of a contract's validity and construction.[47] Our general statutory law of contracts provides but one—the law of the place of performance of the contract. 15 O.S.1981 § 162. The terms of § 162 provide:

"A contract is to be interpreted according to the law and usage of the *place where it is to be performed,* or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." (Emphasis added.)

Section 162 is not a declaration of the rule of *lex loci contractus,* as Panama maintains, but instead is a declaration that generally a contract is to be interpreted under the rule of *lex loci solutionis,* the law of the place of performance.[48] It is only when there is *no indication in the contract* where performance is to occur that the interpretation would apply the *lex loci contractus* rule. In this situation, we look to the contract to determine if there is a place of performance indicated; if there is, the law of the place of performance controls under our statute, and there is no need to determine the law of the place where the contract was made, nor to adopt any other approach to determine the applicable law.

It is apparent from the 1965 stockholders' agreement in contest that performance

43. Cities questions the continued viability of the judicial estoppel doctrine in light of the adoption of the Oklahoma Pleading Code, 12 O.S. Supp.1984 §§ 2001 et seq., which is patterned after the Federal Rules of Civil Procedure. See George Washington L.Rev., *supra* note 42 at 417, where the author notes that a clear majority of the federal circuit courts have held judicial estoppel to be inappropriate when a litigant makes inconsistent assertions in his pleadings or his testimony during the course of a single proceeding. In support of their conclusion that the Federal Rules of Civil Procedure operate as a bar against using judicial estoppel in federal court, these courts usually cite Rule 8(e)(2), which expressly endorses alternative pleading. We need not, and do not now, express an opinion as to the soundness of this doctrine in light of post-*Messler* changes in our pleading code.

44. Other possible defenses against recognition of a foreign nation judgment are lack of jurisdiction, fraud and that the judgment in question was on a governmental claim. *See* Restatement (Second) Conflict of Laws § 98, Comment c and g; A. Ehrenzweig, *supra* note 18, § 55 at 198–

201. Panama does not assert a defense here on any of these grounds.

45. Panama relies on *Telex Corp. v. Hamilton,* Okl., 576 P.2d 767 [1978] and *Pate v. MSA Mutual Ins. Co.,* Okl.App., 649 P.2d 809 [1982].

46. See *infra* note 51 for the most significant relationship test of the Restatement (Second) of Conflict of Laws § 188(2). Panama cites to *Collins Radio Co. of Dallas v. Bell, infra* note 50 and *Rhody v. State Farm Mutual Insurance Co.,* 771 F.2d 1416 [10th Cir.1985] as authority for application of the Restatement test to its breach of contract theory.

47. See Webster, Contractual Obligations, Conflicts of Law Symposium, 18 Okl.L.Rev. 385 [1965].

48. *Collins v. Holland,* 169 Okl. 10, 34 P.2d 587, 588 [1934]; *Sheehan Pipe Line Const. Co. v. State Industrial Com'n,* 151 Okl. 272, 3 P.2d 199 (syllabus ¶ 2) [1931]; *Legg v. Midland Savings & Loan Co.,* 55 Okl. 137, 154 P. 682, 684 [1916].

thereunder will occur partly in New York, where the contract was made, and partly in Brazil. When the agreement was entered into, Cities was a Delaware corporation with its principal place of business in New York. The decisions concerning the agreement were to be made by Cities in New York. But the 1965 stockholders' agreement focuses on a Brazilian corporation and policies relating to its future expansion and dividend distribution, which must occur in Brazil and in accordance with that country's corporation and tax laws. The agreement was made explicitly subject to the industrial, political and financial conditions in Brazil. The implementation of any business decision made by Cities in accordance with the agreement's terms would necessarily require action by Copebras officials in Brazil. Under these circumstances, it is clear that the contract was to be performed in major part in Brazil. We thus conclude that the parties' intent, gleaned from the contract as a whole, requires application of Brazilian law on questions of the contract's validity and enforceability.

### 2. The Restatement's Most Significant Relationship Test

While the Restatement's "most significant relationship" test has been adopted by this court in tort cases,[49] we have not yet extended it to contract questions.[50] Assuming that it applies here, an analysis thereunder also requires application of Bra-

zilian law. We must evaluate five factors to determine which jurisdiction has the most significant relationship to the contract.[51]

The first two factors, *place of contracting* and *place of negotiation,* point to an application of New York law since both of these occurred in New York. But the third and fourth factors, *place of performance* and the *location of the subject matter* of the agreement, suggest that Brazilian law is to be applied. As for the fifth factor, *place of incorporation* and *place of business* of the parties, Cities' contacts are almost wholly in the United States, either in New York or Oklahoma. Panama, on the other hand, is a Panamanian corporation with its principal place of business in ⸰ England.

While factors one and two have significant weight in this test, the *place of performance*—Brazil—is of greater importance here, particularly because of the agreement's conflict with Brazilian law.[52] The Brazilian court ruled that the 1965 letter agreement was unenforceable because its object was illegal under Brazilian law.[53] Section 202(2) of the Restatement says that "[w]hen performance is illegal in the place of performance, the contract will usually be denied enforcement." [54] In sum, all of these factors, considered as a whole, point to application of Brazilian law to the agreement.

**49.** *Brickner v. Gooden,* Okl., 525 P.2d 632 [1974].

**50.** Although the Court of Appeals adopted the Restatement's most significant relationship test in a contract case, *Collins Radio Co. of Dallas v. Bell,* Okl.App., 623 P.2d 1039 [1980], we need not, and do not now, express an opinion on whether this test should be extended to questions concerning the validity and enforceability of contracts.

**51.** The Restatement's "most significant relationship" test, § 188(2), requires an analysis of the following factors:
"(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties."

**52.** Restatement (Second) of Conflict of Laws § 188(2), Comment e, states that:

"The state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform. *So the state where performance is to occur has an obvious interest in the question whether this performance would be illegal.*" (Emphasis added.)

**53.** See *supra* note 13 for the Brazilian court ruling.

**54.** Restatement (Second) of Conflict of Laws § 202(2). The scope of this section is discussed in Comment b:

"The rule applies to illegality existing when the contract was made or arising thereafter, to illegality known to one or to both or to neither of the contracting parties and to permanent or temporary illegality."

## B

### THE ALTERNATIVE BREACH OF DUTY APPROACHES

 The district court ruled that the fiduciary duty owed by a majority to a minority shareholder arises from the place of incorporation of Copebras and is hence governed by Brazilian law. The breach of duty "action", Panama argues, is governed by the laws of New York and Oklahoma—where the fiduciary obligations arose, were maintained and were breached. Panama asserts that fiduciary obligations which derive from a contractual relationship are governed by the law of the place governing the contract, for the tort attaches to the contractual relationship. We assume the argument advanced here is broad enough to include two kinds of duties—the *good faith duty implied in every contract* and the pure *fiduciary duty of the Anglo–American law* that arises from a trust-based relationship.

Underlying the breach of duty theory of recovery is the issue whether it should be characterized as sounding in tort or in contract. Oklahoma jurisprudence indicates that it could be characterized as either, since the breach in some instances is a tort arising out of a contractual relationship.[55] Because Panama's theory is based on breach of fiduciary obligations stemming from the letter agreement, we will apply the choice-of-law rules governing the contract. As noted in Part A, *supra,* this test would lead to the application of Brazilian law.

This conclusion is also in harmony with the Restatement (Second) of Conflict of Laws § 306, which states that "obligations owed by a majority shareholder to the corporation and to the minority shareholders will be determined by the local law of the state of incorporation."[56] The Restatement drafters no doubt viewed the state of incorporation as a "most significant contact" in the resolution of a fiduciary obligation dispute.[57] Since Copebras is a Bra-

---

**55.** Where a contract creates a relation out of which certain implied-in-law duties arise, a breach of which will constitute a tort, the injured party may sue either for breach of the contract or in tort; see *Hall Jones Oil Corporation v. Claro,* 459 P.2d 858, 861 [1969]; *Chicago, R.I. & P. Ry. Co. v. Harrington,* 44 Okl. 41, 143 P. 325, 327 [1914].

The court has extended a tort remedy to insurance contracts for a bad faith breach of the implied-in-law duty of good faith and fair dealing. See *Christian v. American Home Assur. Co.,* Okl., 577 P.2d 899, 901 [1977] (group disability insurance contracts); *McCorkle v. Great Atlantic Ins. Co.,* 637 P.2d 583, 588 [1981] (all types of insurance contracts). We have declined to extend this bad faith tort remedy to commercial loan agreements (*Rodgers v. Tecumseh Bank,* Okl., 756 P.2d 1223, 1226 [1988]) and to strangers to the contract (*Timmons v. Royal Globe Ins. Co.,* Okl., 653 P.2d 907, 912–913 [1982]).

**56.** An exception to this rule is also noted in § 306, which states that

"in the unusual case where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in Section 6 to the parties and the corporation, in which event the local law of the other state will be applied."

Section 6, referred to in § 306 *supra,* lists several factors to be considered when deciding a choice of law question:

"(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issues, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

In our choice-of-law discussion in Part II(A)(2), *supra,* we determined that Brazil has the most significant relationship to this agreement. Comment (c) to Section 306 says that:

"... the local law of some state other than the state of incorporation should not be applied to determine such issues *unless this other state has an interest that is clearly superior* to that of all other states in the issue to be decided.... The local law of some state other than the state of incorporation is most likely to be applied in a situation where the corporation does all, or nearly all, of its business and has most of its shareholders in that other state and has little contact, apart from the fact of its incorporation, with the state of incorporation." (Emphasis added.)

Because this is clearly not the case here, the law of Brazil, Copebras' state of incorporation, should apply to the question of fiduciary duty.

**57.** See *supra* note 51 for the Restatement's "most significant relationship test".

zilian corporation, it would be appropriate under § 306 to apply the laws of Brazil.

### 1. Good faith duty of performance

■ Oklahoma jurisprudence recognizes the common-law notion that implied in every contract is a covenant of good faith and fair dealing.[58] The Restatement also embodies the concept that the promisor owes the promisee good faith in the performance of all contractual terms.[59] Assuming that the law of Brazil also implies a good faith duty, that theory of liability would not be available to Panama here because the Brazilian court's declaration of rescission, which has res judicata effect, operates to extinguish the contract as well as any rights arising thereunder.[60]

### 2. The fiduciary duty

■ A fiduciary duty in the Anglo–American sense is status-based, arising from a relationship of trust.[61] The trustee is bound to act in *uberrimae fidei* [62]—with the utmost good faith—toward the cestui que trust.[63] The Anglo–American trust is a concept of dichotomous title—the trustee has legal title and the beneficiary has equitable title.[64] No counterpart exists in the civil law,[65] and we are not directed to any codification of this dual title concept in the Brazilian civil-law legal system.[66] We

**58.** In *Keel v. Titan Const. Corp.,* Okl., 639 P.2d 1228, 1232 [1982], the court said that accompanying every contract is a common-law duty to perform it with care, skill, reasonable experience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract. See also *Natural Gas Co. v. Pack,* 186 Okl. 330, 97 P.2d 768, 770 [1940]; *Tice v. Tice,* Okl., 672 P.2d 1168, 1171 [1983]; *Allstate Ins. Co. v. Amick,* Okl., 680 P.2d 362, 364 [1984]; for a historical discussion of the concept of good faith and fair dealing in the law of commercial contracts, see *Story v. City of Bozeman,* 791 P.2d 767, 772 [Mont.1990].

**59.** The terms of Restatement (Second) of Conflict of Laws § 205 are:
"Every contract imposes upon each party *a duty of good faith* and fair dealing *in its performance* and in its enforcement." (Emphasis added.)

**60.** On rescission of a contract, it is avoided ab initio and the parties are restored to their pre-contract status. Because all rights and obligations thereunder are ordinarily abrogated, no action can be maintained which is either founded on the rescinded contract or is sustainable only on the theory that the contract remains in force. See *Berlands's Inc. of Tulsa v. Northside Vil. Shop. Ctr., Inc.,* Okl., 447 P.2d 768, 771–772 [1968]; *Hooper v. Commercial Lumber Company,* Okl., 341 P.2d 596, 598 [1959]; *Evans v. Brubaker,* 207 Okl. 42, 247 P.2d 511, 513 [1952].

**61.** *Rees v. Briscoe,* Okl., 315 P.2d 758, syllabus 3 [1957]. Examples of fiduciary relations are those existing between attorney and client, guardian and ward, principal and agent, executor and heir, trustee and cestui que trust and landlord and tenant. See also *Gibson v. Western Fire Ins. Co.,* Okl., 682 P.2d 725, 741 [1984], where the court noted that the duty of a fiduciary to his beneficiary is no less than that of a trustee. The fiduciary, as a trustee, is bound to act in the highest good faith toward his beneficiary.

**62.** Black's Law Dictionary, p. 1363 [5th Ed. 1979].

**63.** The *uberrimae fidei* concept is applied in *Merritt v. Easterly,* 284 N.W. 397, 405 [1939] (principal-agent and *de facto* guardianship); *Wiggins v. Markham,* 108 N.W. 113, 115 [Iowa 1906] (partners); *Lady v. Worthingham,* 57 Cal. App.2d 557, 135 P.2d 205, 207 [1954] (attorney-client).

**64.** *Brinkley v. Patton,* 194 Okl. 244, 149 P.2d 261, 264 [1944]. A trustee is a person who holds legal title to property under an express or implied agreement to apply it and the income arising from it to the benefit of another person who is called the beneficiary or cestui que trust. See *Easterling v. Ferris,* Okl., 651 P.2d 677, 680 [1986]; *Rees v. Briscoe, supra* note 61; see also Hefti, Trusts and Their Treatment in the Civil Law, 5 Am.J.Comp.L. 553, 557 [1956].

**65.** The civil law system has guardianship and power concepts—i.e., power over property—but the fiduciary relationship under a dichotomous title is unknown to that legal system. See Schlesinger, Comparative Law at p. 550–551 [3rd Ed.1970]; see also Hefti, *supra* note 64 at 557, where the author notes that "the trust is intimately related to the duality of law and equity", but that the "civil law is unfamiliar with such a dual system of law"; rather it "forms a single, self-contained legal system." He notes that this "is the source of the difficulty of defining the trust in the language of the civil law, in which the concepts of legal and equitable rights are not available."

**66.** One of Panama's legal experts, Henry P. de Vires, Professor Emeritus of Comparative Law at Columbia University School of Law, noted that the "term 'fiduciary' familiar to lawyers

must hence conclude that the breach of such a duty would not be recognized in Brazil.

## III

## BREACH OF DUTY "CLAIM" UNDER BRAZILIAN LAW

Lastly, we must determine whether the trial court erred in rendering judgment for Cities on the statutory breach of duty prong.

## A

## THE STATUTORY DUTY THEORY DID NOT SURVIVE THE RES JUDICATA EFFECT OF THE BRAZILIAN JUDGMENT

█ Panama asserts that Cities *qua* controlling shareholder of a Brazilian corporation breached the duties and obligations owed by it under both the 1965 contract and Articles 116 and 117 of Brazil's Corporation Law. Because these theories of recovery are predicated on the same alleged conduct of Cities,[67] it follows that the contractual obligations are identical to those imposed by Brazilian law on a controlling shareholder.

Assuming the duties are the same, this fact could have been tendered by Panama as another defensive theory in the Brazilian litigation because a declaration of the contract's invalidity would not relieve Cities of its statutory duties. In other words, Panama could have defended against the quest for rescission by showing that it would not result in any effective relief.[68]

The Brazilian judgment is a complete claim-preclusion bar to this theory because res judicata in the Anglo–American sense bars not only the defensive theories actually interposed therein, but any defenses that could have been raised in that action.[69] Panama failed to urge, in the Brazilian lawsuit, the defense of Cities' statutory duties and is hence barred from pressing this theory as the basis of a second action involving the same subject matter and the same parties.

Assuming as a matter of comity that preference would be given to Brazilian law in determining the preclusive effect of the judgment,[70] we must still apply here the

---

who have inherited the 'trust' language of the courts of equity has no true equivalent in Brazilian legal language."

Dr. Paul Griffith Garland, Cities' legal expert and author of Doing Business In and With Brazil [Banco Lar Brasileiro S.A., 1973], explained in his book that Brazil is known as a civil-law jurisdiction, that is, one which uses a code or codified method, in contrast with the judicial-precedent or common-law approach historically characterizing Great Britain and the countries whose system it has influenced. See Garland, *supra* at p. 33.

While several civil law jurisdictions have enacted trust statutes, we are not aware of similar statutory law in Brazil. See K.R. Ryan, The Reception of the Trust, 10 Int. & Comp.L.Q. 265 (1961), where the author lists the following civil law jurisdictions with trust statutes—Quebec, Liechtenstein, Panama, Puerto Rico, Mexico, Venezuela, Louisiana, Scotland and Ceylon.

67. Cities' August 4, 1987 Motion for Summary Judgment contains a statement of undisputed fact that both theories of recovery are "predicated on the same alleged conduct of Cities as the majority shareholder of Copebras." Panama admits in its September 1, 1987 response that "no dispute" exists as to this fact.

68. In Oklahoma jurisprudence, a case will be dismissed for mootness when no effective relief can be afforded the parties. *Hamilton v. Investment Towers Corporation*, Okl., 489 P.2d 488, 490 [1971]; *Wolfe v. Hart's Bakeries, Inc.*, Okl., 460 P.2d 950, 952 [1969]; *Edwards v. Hanna Lumber Co.*, Okl., 415 P.2d 980, 981 [1966]; *Duncan v. Sims*, Okl., 277 P.2d 145, 146 [1954]; *Westgate Oil Co. v. Refiners Production Co.*, 172 Okl. 260, 44 P.2d 993, 994 [1935]; *In Re Protest Against Referendum Petition No. 5*, 185 Okl. 393, 92 P.2d 374, 375 [1939]; *Ham v. McNeil*, 27 Okl. 773, 117 P. 207 [1911].

69. *Mitchell v. Williamson*, Okl., 304 P.2d 314, 319 [1956]; *Dierks v. Walsh*, 196 Okl. 372, 165 P.2d 354, 358 [1946]; *Engle v. Legg*, 39 Okl. 475, 135 P. 1058 (syllabus ¶ 2) [1913]; see also *Depuy v. Hoeme*, *supra* note 27 at 1343 n. 22; *Veiser v. Armstrong*, *supra* note 25 at 800 n. 9; *Mobbs v. City of Lehigh*, *supra* note 27 at 549 n. 5; *Allen v. McCurry*, *supra* note 27, 449 U.S. at 94, 101 S.Ct. at 414; Bishop and Burnette, *supra* note 18 at 440–441.

70. Once a foreign-nation judgment has been recognized, some American courts, *on the basis of comity,* have given a foreign judgment the same effect to which it is entitled in the jurisdiction where rendered. See *Schoenbrod v. Siegler*, 20 N.Y.2d 403, 283 N.Y.S.2d 881, 230 N.E.2d 638, 641 [1967]; *Adamsen v. Adamsen*, 151 Conn. 172, 195 A.2d 418, 421 [1963]; *Bata v. Bata*,

domestic law of res judicata. This is so because we are without the benefit of proof as to the scope of Brazil's res judicata jurisprudence and must conclude that its outer limit is the same as our own.[71]

### B

### BRAZILIAN LAW DOES NOT RECOGNIZE A DUTY OWED BY A MAJORITY TO A MINORITY STOCKHOLDER

Even if this theory had survived the preclusive effect of the Brazilian judgment, we would still conclude there was no error in the trial judge's determination that Brazilian law does not permit an individual stockholder's claim against a controlling shareholder for breach of statutory duty.

Before addressing this issue we must determine whether the trial court erred in failing to disqualify one of Cities' expert witnesses whose affidavit was submitted to the trial court on the status of Brazilian law.

#### 1., The Competency of Cities' Expert Witness

■ Panama asserts the trial court erred in refusing to strike the affidavit of Cities' expert witness, Jose M. Pinheiro Neto. His disqualification is sought because he had represented Panama as a lawyer in the early 1970's on matters relating to the 1965 letter agreement. Pinheiro's law firm had also represented Cities in the Brazilian declaratory judgment suit. Panama's disqualification quest is based on violations of the conflict of interest prohibition in Rule 1.9, Rules of Professional Conduct,[72] and Canon 9, Code of Professional

*supra* note 17 at 504; *Bank of Montreal v. Kough,* 430 F.Supp. 1243, 1251 [N.D.Cal.1977]. By way of limitation, most courts have refused to give foreign-country judgments any greater force or effect than that afforded to sister-state judgments. See Bishop and Burnett, *supra* note 18 at 441; Restatement (Second) of Conflict of Laws § 98, Comment f.

*Cf.* Wright, Miller, Cooper, 18 Federal Practice and Procedure § 4473, p. 745–747 [1981]. The authors note in § 4473, n. 10, that the "practice of some courts in considering the treatment of res judicata by the foreign court that rendered a judgment is 'subject to criticism. If the judgment has been handed down by a reliable court after full litigation, it would seem that relitigation of the matter in an American court is undesirable and wasteful regardless of the attitude of the foreign court on the matter of res judicata/preclusion. The decisions of the American courts should be based on the interests and values of our courts and litigants rather than the attitudes of the foreign court involved * * *.' Vestal, Preclusion/Res Judicata Variables: Adjudicating Bodies, 1966, 54 Geo.L.J. 857, 873." *Wright, supra,* also states in n. 10 that "Professor Reese has argued that comity and like theories cannot explain the reasons for enforcing foreign judgments, and that the central reasons for recognition and enforcement lie in the value of res judicata. Reese, The Status in This Country of Judgments Rendered Abroad, 1950, 50 Col.L.Rev. 782, 782–786. This foundation could easily be built into the conclusion that *domestic courts should be able to apply their own policies of res judicata* even though the result is to accord a preclusive effect that would not be recognized in the judgment." (Emphasis added.)

*Smit, supra* note 17 at 63, notes that giving a foreign judgment the same effect that it would have in subsequent domestic proceedings that it would have in subsequent proceedings in the foreign forum "is perhaps reconcilable with the doctrines that base the recognition of foreign judgments on comity or on a presumed legal obligation created by the foreign judgment, but it is *indefensible under a res judicata rationale."* (Emphasis added.) The author states that "if, in granting effect to foreign judgments a domestic policy of res judicata is promoted, it is unwarranted to defer to foreign principles in determining the actual effect of such judgments. Such deference is not only illogical, but imposes on every person relying on a foreign judgment the often difficult and expensive burden of proving the foreign law of res judicata. In addition, it saddles the courts with the sometimes pioneering and always difficult task of construing the applicable foreign law." The author opines that "making the extent of the local effect of foreign judgments dependent directly on domestic principles, would seem to find strong support in both logic and ease of application."

71. *Benham v. Keller,* Okl., 673 P.2d 152, 153 [1983].

72. 5 O.S.Supp.1988, Ch. 1, App. 3-A. Rule 1.9 provides in pertinent part:
"A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a substantially related matter in which that person's interests are materially diverse to the interests of the former client unless the former client consents after consultation; or (b) use information relating to the representation to the disadvantage of the former client. . . ."

Responsibility.[73]

The argument presented here is not one that can be advanced under the disciplinary rules governing a lawyer's professional conduct. Those rules are not decisive of issues pertaining to the bias or interest of a witness. The record indicates that Pinheiro participated in the proceedings below only by affidavit testimony as an expert witness on the status of Brazilian law. There is no indication that he had been engaged as counsel in those proceedings.

The Evidence Code [Code][74] governs as to matters of a witness' interest or bias.[75] Section 2601 of the Code[76] provides that every person is competent to testify as a witness except as otherwise provided

therein. A witness' bias or his interest in the outcome of an action does not make him an incompetent witness under § 2601; rather, it may be shown only to impeach his testimony and affect his credibility.[77] There is hence no basis under either the Code or the disciplinary rules to disqualify Cities' expert witness.

## 2. The Status of Brazilian Law

The controversy centers on (a) whether Article 246 of the Brazilian Corporation Law constitutes the exclusive method of enforcement of Articles 116 and 117[78] and thus precludes an individual stockholder suit or (b) whether a minority shareholder has a right of action based on general-tort

---

**73.** 5 O.S.1981, Ch. 1, App. 3. The terms of Canon 9 are:
"A Lawyer Should Avoid Even the Appearance of Professional Impropriety"

**74.** 12 O.S.1981 §§ 2101 et seq.

**75.** In *Braden v. Hendricks*, Okl., 695 P.2d 1343, 1347 [1985], the court holds that the Evidence Code clearly contemplates the use of bias as a ground of impeachment.

**76.** The terms of 12 O.S.1981 § 2601 are:
"Every person is competent to be a witness except as otherwise provided in this Code."

**77.** Bias can be exposed by showing the witness' relationship to the case, his financial interest in the outcome or his association with one of the parties. *Braden v. Hendricks, supra* note 75 at 1347–1348.

**78.** The terms of Article 116 of Brazilian Corporation Law (Law No. 6.404 of December 15, 1976) are:
"A *controlling shareholder is* an individual or *a body corporate,* or a group of individuals or bodies corporate joined by a voting agreement or under common control, *which:*
(a) *possesses rights which permanently assure it a majority of votes* in resolutions of general meetings and the power to elect a majority of the company officers; *and*
(b) in practice *uses its power to direct the corporate activities* and to guide the operations of the departments of the company.
Sole Paragraph. A *controlling shareholder shall* use its controlling power to make the company accomplish its purpose and perform its social role, and shall *have duties and responsibilities towards the other shareholders* of the company, those who work for the company and the community in which it operates, the rights and interests of which the control-

ling shareholder must loyally respect and heed." (Emphasis added.)
The pertinent terms of Article 117 of Brazilian Corporation Law provide:
"A *controlling shareholder shall be liable for any damage caused by acts performed by abuse of its power.*
Paragraph 1. An *abuse of power may take any of the following forms:*
(a) to guide a company towards an objective other than in accordance with its objects clause or harmful to national interests, or *to induce it to favour another Brazilian or foreign concern to the detriment of the minority shareholders' interests in the profits or assets of the company* or of the Brazilian economy;
* * *"
"(c) *to provide for ... an adoption of policies or decisions which* are not in the best interests of the company but *are intended to cause damage to the minority shareholders....*" (Emphasis added.)
The terms of Article 246 of Brazilian Corporation law provide in pertinent part:
"The controlling company shall be required to make good the damages which it causes to the company by means of acts practiced in violation of the provisions of Articles 116 and 117.
§ 1. The action to receive reparation lies:
(a) to shareholders which represent 5% (five percent) or more of the corporate capital;
(b) to any shareholder, provided that he gives a guarantee for costs and attorneys' fees due in the event that the action is judged lacking in merit.
§ 2. The controlling company, if condemned, in addition to making good the damages and bearing the costs, shall pay attorneys' fees of 20% (twenty percent) and a surcharge of 5% (five percent) to the plaintiff in the action, calculated upon the amount of the indemnification."

principles of the Brazilian Civil Code.[79] Articles 116 and 117 seem to create a duty owed by majority to minority shareholders, but they do not indicate whether a cause of action arising from the breach of such a duty may be brought only derivatively or on behalf of individual shareholders. Article 246 permits minority shareholders to bring an action for damages against the controlling company (Cities) only by the controlled company (Coprebras) or derivatively by any shareholder for the benefit of the controlled company.

■ The trial court may take judicial notice of a foreign country's laws if it can be properly informed of its terms.[80] The applicability and tenor of foreign law is a matter for the court.[81] If the trial court cannot be properly informed of the foreign country's law from reference to its sources, the state of that law is subject to the ordinary proof process as in the case of any other fact.[82] The court may consult or use any source of pertinent information, whether it be offered by the parties or discovered through its own research, in determining the applicability of foreign law.[83] The usual method of proving foreign law is by affidavit testimony of qualified legal ex-

**79.** This view was expressed in the affidavits of Cities' expert witnesses. They deemed corporations to be governed entirely by the Corporation Law, (Law No. 6.404 of December 15, 1976). Articles 116 and 117, *supra* note 78, set forth the duty of fairness and the standard of behavior required of a controlling shareholder vis-a-vis minority shareholder. Under Article 246, *supra* note 78, an action under Articles 116 and 117 may be brought only by (1) the controlled company itself; or (2) by any shareholder for the benefit of the corporation and (3) in either event, the action is permitted only to recover for damage or injury to the corporation, rather than for any damage or injury unique or personal to a shareholder. If the action is brought by a shareholder of the controlled corporation, the action is derivative in nature with any damage recovery being paid to the controlled corporation and not to the shareholder who maintains the derivative action.

The district court did not find persuasive the contrary view of Panama's expert witnesses who viewed Article 246 as not limiting or restricting minority shareholders from bringing suit to redress a wrong which they have sustained individually. They deemed the minority shareholder to have a right of action based on general tort principles of the Brazilian Civil Code.

**80.** The terms of 12 O.S.1981 § 2201(B)(2) are:

"B. Judicial notice may be taken by the court of: * * *
 2. The laws of foreign countries."

**81.** The terms of 12 O.S.1981 § 2201(C) are:

"The determination by judicial notice of the applicability and tenor of any matter of common law, constitutional law or of any statute, private act, resolution, ordinance or regulation shall be a matter for the judge and not for the jury."
Subsection C merely states the commonly accepted principle that the determination of matters of law are matters for the court. See § 2201, Evidence Subcommittee's Note; Whin-

ery, Manual of Evidence, Part B, Sections 1 and 2, pgs. 11–12.

**82.** See 12 O.S.1981 § 2201, Evidence Subcommittee's Note.

Under Oklahoma's preexisting common-law, foreign law was a fact (*Gray v. Martin*, 206 Okl. 167, 242 P.2d 698, 700 [1952]; *Allen v. Allen*, 201 Okl. 442, 209 P.2d 172, 176 [1948], *cert. denied*, 336 U.S. 956, 69 S.Ct. 891, 93 L.Ed. 1110 [1949]; *Kennedy v. Chadwell*, 193 Okl. 304, 142 P.2d 979, 981 [1943]; *Hinds v. Atlas Acceptance Corporation*, 178 Okl. 474, 63 P.2d 29, 31 [1936]) which had to be pleaded (*Hinds v. Atlas Acceptance Corporation, supra*) and proved by competent evidence (*Cherokee Public Service Co. v. Harry Cragin Lumber Co.*, 174 Okl. 67, 49 P.2d 723, 726 [1935]) like any other fact, whether such law was statutory (*Gray v. Martin, supra*) or otherwise. See also Sommerich and Busch, The Expert Witness and The Proof of Foreign Law, 38 Cornell Law Quarterly 125, 126–129 [1953]. The adoption of a judicial notice statute supplemented and liberalized the common-law fact approach to proving foreign law. *Absent anything to the contrary in the pleading code, we must assume the legislature intended to leave undisturbed Oklahoma's treatment of foreign law as a fact issue on review.*
*Cf.* Fed.R.Civ.P. 44.1. Under the federal civil procedure rules the determination of foreign law is *treated as a matter of law on appeal*, although it is proved essentially as a matter of fact. *Ganem v. Heckler*, 746 F.2d 844, 854 [D.C. App.1984]. Because foreign law is a *law issue* under Rule 44.1, federal circuit courts will generally decide this issue after an independent examination of foreign legal authorities. See Foreign Law Issues–Rule 44.1, 62 ALR Fed 521 [1983].

**83.** The terms of 12 O.S.1981 § 2203(A)(1) are:

"A. In determining the propriety of taking judicial notice of a matter:
 1. The court may consult and use any source of pertinent information, whether or not furnished by a party; * * *"

perts.[84] The person pleading the law of a foreign country has the burden of going forward with proof of it at the risk of nonpersuasion.[85]

■ Assessing the soundness of Panama's position on all the sources that were submitted for our examination, we are not persuaded that Brazilian Civil or Corporation law permits an individual stockholder action against a majority controlling shareholder for breach of a fiduciary duty. Panama, which has the burden of proving that a suit under Brazilian law may be brought on behalf of an individual shareholder, has not given us access to source material that demonstrates error in the trial judge's exposition of the applicable law. We only have before us the affidavits of Panama's and Cities' legal experts which sharply disagree as to the interpretation of Brazilian statutory and decisional law. There is also disagreement as to whether the experts properly construed and relied upon the opinions of commentators and text-writers which interpret Brazil's general statutory and corporation law. Absent an opportunity to review the source materials relied upon by the legal experts, we are unable to divine a contrary conclusion from that reached by the trial court. We hold the trial court correctly resolved this foreign law issue.

## C

## JUDICIAL ESTOPPEL

Panama argues that under the doctrine of judicial estoppel, Cities is precluded from maintaining its present position that the fiduciary status of the parties vis-a-vis one another is not recognized in Brazil. Whatever the merits of this doctrine might be in theory, it has no application here. Our examination of the four corners of the New York affidavit fails to indicate Cities assumed inconsistent positions in the New York and Oklahoma proceedings with respect to the nature or extent of Brazilian law on enforceability of fiduciary duties.

In sum, we recognize the Brazilian judgment for reasons of practicality, fairness and policy and because no defense has been shown for not according it res judicata effect as to the breach of contract theory of recovery. Brazilian law is applicable to the breach of duty theory because (1) the fiduciary duty arises out of the agreement, (2) the agreement was to be performed in Brazil and (3) application of Oklahoma or New York law would be in sharp conflict with Brazil's legal tradition. Panama cannot recover under the breach of duty prong because a fiduciary duty is not recognized under Brazil's civil law system and its statutory law does not permit an individual stockholder's action for damages.

The trial court's judgment is affirmed.

**84.** The pertinent provisions of 12 O.S.1981 § 2702 are:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise."

See also 62 ALR Fed at 538, § 7, *supra* note 82; Note, Pleading and Proof of Law of Foreign Country, 75 ALR3d 177, 194, § 6 [1977].

**85.** See *Tidewater Oil Co. v. Waller*, 302 F.2d 638, 640 [10th Cir.1962].

Under Oklahoma jurisprudence the party relying on the law of a foreign country, either in support of its claim or as a defense thereto, must clearly explain the state of that law. When no foreign law is invoked, the domestic law of Oklahoma will be deemed *to* govern. See *Benham v. Keller, supra* note 71 at 153.

This is generally known as a presumption of similarity or local-law rule and is relied upon to avoid the often harsh result of dismissal and to mitigate the burden of proving foreign law. See Sommerich and Busch, *supra* note 82 at 140. The presumption is invocable (1) if the rights of both parties are governed by foreign law; (2) neither party offers evidence concerning such law and (3) the court does not take judicial notice of it. Some courts limit the applicability of this presumption to the law of other common-law jurisdictions. See Annot., Presumption as to law of foreign countries, 75 ALR2d 529, 531 § 1 [1961]. Absent proof of foreign law, some courts have applied the law of the forum on a presumption of acquiescence in the law of the forum. See Sommerich and Busch, *supra* note 82 at 142–143. The presumption does not apply here because both Panama and Cities offered evidence as to the applicability and tenor of Brazilian law and the trial court agreed with Cities' view of Brazilian law.

HARGRAVE, C.J., and LAVENDER, DOOLIN and SUMMERS, JJ., concur.

KAUGER, J., concurs in part and dissents in part.

SIMMS, J., concurs in judgment.

HODGES and ALMA WILSON, JJ., dissent.