William H. DAVIS, Trustee of the Joe D. Davis Revocable Trust, Plaintiff,

v.

SONAT EXPLORATION COMPANY, Defendant.

No. 94–C–828–H.

United States District Court, N.D. Oklahoma.

Oct. 17, 1995.

James W. Rusher, Gerald R. Shrader, Heath E. Hardcastle, Albright & Rusher, Tulsa, OK, for Plaintiff.

Drew Neville, Jr., David E. Pepper, Deborah A. Wolfe, Linn & Neville, Oklahoma City, OK, for Defendant.

## *ORDER*

HOLMES, District Judge.

This matter comes before the Court on a motion for summary judgment by Defendant Sonat Exploration Company ("Sonat") (Docket # 17).

Plaintiff William H. Davis brought this action against Sonat alleging that Sonat breached the terms of a letter agreement between Sonat and Mr. Davis, in his capacity as trustee of the Joe D. Davis Revocable Trust. Mr. Davis contends that Sonat im-properly terminated a letter of intent to purchase certain properties from Mr. Davis and that such termination violated Sonat's implied duty of good faith and fair dealing. He also asserts that Sonat's conduct was wanton, willful, grossly negligent and indicated a reckless disregard for his rights.

Summary judgment is appropriate where "there is no genuine issue as to any material fact," *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Windon Third Oil & Gas Drilling Partnership v. Federal Deposit Insurance Corp.,* 805 F.2d 342, 345 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987), and "the moving party is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c). In *Celotex,* the Supreme Court stated:

> [t]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322, 106 S.Ct. at 2552.

A party opposing a properly supported motion for summary judgment must offer evidence, in admissible form, of specific facts, Fed.R.Civ.P. 56(e), sufficient to raise a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In *Anderson,* the Supreme Court stated:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

477 U.S. at 252, 106 S.Ct. at 2512. Thus, to defeat a summary judgment motion, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

For purposes of this motion, the Court accepts as true certain allegations by Mr.

Davis which are identified herein. As a result, the facts necessary to decide this motion, as determined from the record, are not in dispute.

The Agreement contained certain conditions which Sonat drafted with the express intent of protecting its interests. Specifically, paragraph 10(a) of the Agreement provides that "Sonat's obligation to purchase the properties from Seller shall be subject to . . . Sonat's satisfaction with the results of its full and complete due diligence. . . ."

Because paragraph 10(a) renders its obligation to perform contingent upon its "satisfaction," Sonat claims that the provision allowed it to terminate the Agreement when it was dissatisfied with the results of its due diligence. Sonat asserts that it terminated the Agreement because its on-site inspections of the properties revealed potential environmental problems which could result in significant clean-up costs. By contrast, Mr. Davis alleges that Sonat's alleged basis for dissatisfaction was pretextual, and thus the resulting termination violated both the explicit terms of the Agreement and the implied duty of good faith and fair dealing.

■ Interpretation of the Agreement is governed by Oklahoma law. *See United States v. Hardage*, 985 F.2d 1427, 1433 (10th Cir.1993). It is settled law that "Oklahoma jurisprudence recognizes the common-law notion that implied in every contract is a covenant of good faith and fair dealing." *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 728 (10th Cir.1991) (citing *Panama Processes v. Cities Serv. Co.*, 796 P.2d 276, 290 (Okl. 1990)). This implied covenant directs that a party cannot " 'destroy or injure another party's right to receive the fruits of the contract.' " *Id.* (quoting *Wright v. Fidelity & Deposit Co.*, 176 Okla. 274, 54 P.2d 1084, 1087 (1936)). Davis asserts that Sonat breached this duty by declining to consummate the proposed transaction.

■ Although a duty of good faith is implicit in all contractual agreements, the parameters of the duty "must be viewed in relation to the type of transaction involved." *Overbeck v. Quaker Life Ins. Co.*, 757 P.2d 846, 849 (Okl.Ct.App.1984) (no breach of the implied duty of good faith for terminating employee whose contract provided for at-will employment). Thus, if Sonat was exercising its explicit authority to terminate under the Agreement, it did not breach the implied duty of good faith. Therefore, the central issue here is whether Sonat's decision not to purchase the Davis properties resulted from a good faith dissatisfaction with its due diligence in accordance with the provisions of the Agreement.

The law recognizes two possible constructions of the term "satisfaction" as used in the instant contract:

> Courts have observed that satisfaction clauses should fall into two categories of review: (1) those that call for satisfaction as to "commercial value or quality, operative fitness, or mechanical utility," which are interpreted under a reasonableness standard, and (2) those that require the consideration of a "multiplicity of factors" and involve "fancy, taste, or judgment," which should be analyzed under a good faith standard.

*Misano di Navigazione, SpA v. United States*, 968 F.2d 273, 275 (2d Cir.1992) (citations omitted). In *Ledford v. Wheeler*, 620 P.2d 903 (Okl.Ct.App.1980), the Oklahoma Court of Appeals utilized the "good faith" or subjective standard in construing a satisfaction clause. The clause at issue in *Ledford* allowed a prospective real estate buyer to cancel the transaction if his examination of the title proved unsatisfactory. The court held that "it was clearly intended and understood that the Buyer could only back out because of good faith concern about the title. While satisfaction was to be judged by the Buyer, this satisfaction was one determined in good faith and not by whim." *Id.* at 906.

While the Oklahoma court applied the good faith standard in *Ledford*, it failed either to articulate why it chose that standard or to address the possibility of using the alternative, reasonableness standard, under which the question is whether the decision to terminate was "reasonable" as a matter of law. Other courts, however, have explained the proper application of the good faith standard.

In *Misano,* the plaintiff entered into a contract with the federal government to transport a cargo of fuel oil. 968 F.2d 273. The government unilaterally canceled the contract upon the determination of its representative that plaintiff's ship was incapable of safely carrying the cargo. The *Misano* court held that a "multiplicity of factors" involved in the government's decision to terminate a shipping contract called for the application of a "good faith" standard. *Id.* at 275–76.

The California Supreme Court also applied a good faith standard in *Mattei v. Hopper,* 51 Cal.2d 119, 330 P.2d 625 (1958) (*en banc*). Under the terms of the *Mattei* contract, the plaintiff's obligation to purchase land from the defendant was dependant upon his obtaining "satisfactory" leases. *Id.* 330 P.2d at 626. The purchaser succeeded in obtaining satisfactory leases, but the seller refused to sell the land. In the subsequent breach of contract action, the seller asserted that no contract existed because the satisfaction clause rendered the buyer's promise illusory and thus the Agreement failed for lack of consideration. The court held, however, that the buyer's promise was not illusory because he could terminate only in "good faith." The court concluded that the "good faith" standard was applicable because "the factors involved in determining whether a lease is satisfactory to the lessor are too numerous and varied to permit the application of a reasonable[ness] standard." *Id.* The court noted that "[w]here the question is one of judgment, the promisor's determination that he is not satisfied, when made in good faith, has been held to be a defense to an action on the contract." *Id.* (citations omitted).

In *Action Engineering v. Martin Marietta Aluminum,* 670 F.2d 456 (3d Cir.1982), a contractor brought an action for wrongful termination of a construction contract. The contract provided that "[i]f in Owner's opinion, contractor fails to carry on the work diligently and on schedule ... Owner shall have the right ... to terminate this contract forthwith." *Id.* at 457. The district court held that the defendant's termination of the contract was unreasonable. The Third Circuit reversed, concluding that "[defendant's] termination was within its contractual rights if [its] decision that [plaintiff] would not complete the contract on time was made in good faith." *Id.* at 460. The court applied the subjective standard because the defendant's decision to terminate the contract was based upon its weighing of a " 'multiplicity of factors.' " *Id.* at 461.

■ The good faith standard applies in the instant case. Consistent with the holding in *Ledford,* this Court finds that Oklahoma law contemplates the application of the good faith or subjective standard in cases where a "multiplicity of factors" are present. The record reveals that Sonat would have considered just such a "multiplicity of factors" in determining whether its was satisfied with its due diligence. Such factors included without limitation the potential environmental condition of each of the properties at issue, the cost of remedying existing and potential environmental damage and the extent of future potential environmental liability. The numerous factors entering into Sonat's decision compels this Court to examine the record and to apply a "good faith" standard in determining whether Sonat's withdrawal from the Agreement was permissible under its terms.

■ Sonat asserts that, as part of its due diligence, it conducted environmental and safety inspections of the properties and, according to Sonat, "[t]hese on-site inspections revealed poor maintenance of the properties and potential environmental liabilities." Def.'s Mot. for Summ.J. at 2. The record is undisputed that the properties were investigated by Sonat's operating personnel on June 10, 1994. Minor dep. at 50. In addition to written reports prepared by Sonat's investigators, a videotape of the properties was made on the same date. The record provides that Sonat's investigation reflected the following:

a. *Mattie Barnes Central Compressor Facility/Barnes 1–13 well.* This facility and well are operated by the Trust. A heavy oil stain with sheen on standing water was observed in a 10' × 15' area around the compressor package. A diked water tank near the compressor appeared to contain a mixture of water and oil since stained oil was

observed within the diked area. Apparently, this containment area had been periodically drained by a pipe/valve drain system, because stained soil was found leading from the tank containment drain system area and along natural drainage patterns off-site. Pools of standing water with oil sheens were noted at numerous other parts of the location.

b. *The Barber 1–12 well.* This well and location are operated by the Trust. A 10' × 10' area of oil-stained soil was found on location, apparently where a compressor once existed. Surface appearance and the absence of a pipeline connected to the water tank suggest that free liquids from the well have been repeatedly dumped on the ground. Alternatively, these liquids may be flowing into a pond off-site, as Sonat personnel observed a fabricated structure in the pond that appears to be some type of splash control, and continuous bubbles were observed at the entrance of this structure. All of the above suggests a discharge into this pond of some nature.

c. *Barrow 1–12 well.* This well and location are operated by the Trust. Again, surface appearance (a 50' × 80' area of dead vegetation at the terminus of a pipe connected to the production unit) and the absence of a water tank indicate that produced liquids are being dumped on the ground.

d. *Rowland 1–33 well.* This well and location are operated by Stephens Production Company. A 8' × 8' oil stain was found on location, apparently where a compressor once existed.

e. *Brant 1–11 well.* This well and location are operated by Stephens Production Company. Surface appearance and the absence of a water tank indicate that produced liquids are being dumped on the ground.

f. *Charles Smith 1–18 well.* This well and location are operated by Stephens Production Company. A 60' × 60' heavy oil stain was observed around the compressor. An oil sheen was visible on standing water in several areas of the location.

g. *Goodloe 1–23 well.* This well and location are operated by Samson Resources Company. A 6' × 6' oil stain was observed in the area of the compressor and water tank.

Def.'s Resp. to Interrog. 1, ¶¶ a–g.

It is undisputed that Sonat's field representatives prepared itemized reports of the potential costs of bringing three of the properties—Barrow 1–12, Barber 1–12 and Mattie Barnes C.P.—into compliance with Sonat's operating standards and estimated such costs at $52,865, $55,415 and $49,450, respectively. Hale mem., def.'s ex. 14.

David Minor, the Sonat employee responsible for making the final decision, Minor dep. at 47, testified that, as a result of the field inspection of the properties, he could not recommend to Sonat's senior management that Sonat complete the transaction. *Id.* at 49–50. Mr. Minor stated that his field representatives recommended to him—both orally and in writing—that Sonat not proceed with purchasing the properties. *Id.* at 68. He testified that he relied on the information he received from the field inspection, including the videotape, the cost assessments, and the written reports of his field inspectors, to make his own judgment as to the potential environmental liability that might exist at the properties. *Id.* at 85–86, 108. Mr. Minor specifically cited the videotape's portrayal of oil on the ground and the evidence that saltwater had been on the ground. *Id.* at 88. Mr. Minor received the final environmental reports on June 27, 1994, *see* Minor dep. at 108, and Sonat notified Mr. Davis of its decision to withdraw from the Agreement on June 30. Pl.'s Resp. to Def.'s Mot. for Summ.J., ex. 11.

By contrast, Mr. Davis claims that Sonat's expressed environmental concerns were pretextual. In his pleadings, he suggests three possible explanations why Sonat might have terminated the Agreement:

Sonat did not want to pursue the purchase because it had offered too much for the properties. Further, Sonat field personnel may have embellished the environmental

concerns because they did not want to maintain and operate the additional properties. Also, Sonat may have failed to finalize the transaction due to corporate politics.

Pl.'s Resp. to Def.'s Mot. for Summ.J. at 2. In support of this assertion, Mr. Davis relies primarily upon the deposition testimony of Jack Wheeler, a former Sonat employee.[1] Mr. Wheeler testified that the environmental concerns raised by Sonat's due diligence may not have been the reason it withdrew from the Agreement. He stated that

> the only reason why the deal was not consummated was because David Minor was scared to go back to [Chairman of the Board] Russell after the discussion of the environmental concerns and admit that they were not as significant and a deal killer as what [Mr. Minor] represented initially.

Wheeler dep. at 20. Mr. Wheeler also asserted that another Sonat employee, Michael Lynch–Blosse, had expressed a view that the environmental concerns were "bogus" and that the Sonat personnel who conducted the due diligence were "puffing" and "expounding" because they did not want to operate some of the properties.[2] *Id.* at 60, 125.

Mr. Wheeler further stated, however, that he understood Sonat believed the cost of remedying the environmental problems would be $157,000:

Q. Was it your understanding that the environmental aspects were the reasons for terminating the deal?

A. Yes.

Q. Did the $160,000 figure, did you understand that was all costs to remedy environmental problems?

A. I understood it as being the costs to get it up to Sonat's standards, and I remember we had conversations where Michael Lynch–Blosse was trying to pin them down as to how much of that was to get it to minimum standards and how much of it was to get it to the Sonat way, but I never heard a dollar figure differentiated.

Q. Did you ever hear a dollar figure on what it would cost to remedy just the environmental problems and not the gap between environmental problems and Sonat's standards?

A. No. And, once again, I mean, in the memo they set standards and that is where I get that. It may be that it took the whole $157,000 to get it to minimum standards. I just don't know.

Wheeler dep. at 195–96.

More importantly, *Mr. Wheeler stated that he believed the cost of remedying the environmental problems identified in the due diligence was so significant as to render the*

1. Plaintiff also offers the testimony of an expert in environmental science, Thomas J. Anderson. Mr. Anderson asserts that "[n]one of the properties operated by the [Davis Trust] evidence any violations of any applicable environmental laws or regulations." Pl.'s Resp. to Def.'s Mot. for Summ.J., at exh. 2. The expert further opines that one of the Davis properties which was not operated by Davis could be brought up to industry standards for less than $10,000. *Id.* These assertions, however, do nothing to contradict statements by Sonat that it estimated the costs of bringing the properties into compliance with Sonat's own environmental standards would be at least $157,000. It is undisputed that Sonat believed these costs were necessary. Under applicable law, Sonat's good faith belief is the controlling factor in this Court's subjective inquiry, *see Mattei v. Hopper,* 51 Cal.2d 119, 330 P.2d 625, 626 (1958), and Sonat's evidence as to its belief with respect to the clean-up costs is not contraverted by the opinion of plaintiff's expert regarding his estimated cost of compliance with

environmental laws. Thus, there is no issue of material fact with respect to whether Sonat believed the total clean-up costs would exceed $157,000.

Similarly, the Court discounts Mr. Davis' reliance upon the fact that Sonat rejected his offers to clean-up and/or indemnify Sonat for the environmental problems. *See id.* at 9. Because Sonat's subjective satisfaction is the proper focus of this motion, and Mr. Davis has not contraverted Sonat's assertion of genuine dissatisfaction, the reasonableness of Sonat's rejection of Mr. Davis' offer of indemnification is not legally significant.

2. Mr. Lynch–Blosse served as a business team leader of the Sonat business unit. "He was business development leader. He was the one who wanted to do the exploration. He was the driving force behind it." Wheeler dep. at 23. Even after Mr. Wheeler recommended that Sonat not pursue Davis' properties, Mr. Lynch–Blosse, alone, recommended that Sonat continue the purchase. *Id.* at 153–157.

**192**

*consummation of the transaction inadvisable,* stating in applicable part as follows:

A. *So I was concerned if you have a $600,000 acquisition, and you have 200,000, or 160,000, or 157,000 liability, we shouldn't be doing the deal.* And that was my gut feeling and that was my reaction.

Q. Did you communicate that to anybody at Sonat?

A. Yes, I told Minor that, and I told Michael Lynch–Blosse that, and I told Chris Furrh that.

Wheeler dep. at 152 (emphasis added).

Thus, the testimony is clear that Sonat's management believed that the cost of cleaning up the properties would be at least $157,-000. Furthermore, Mr. Wheeler testified that, based upon these clean-up estimates, he himself believed Sonat should terminate the Agreement. This view was the same as the position of Sonat and certainly sufficient to support the conclusion that Sonat was not "satisfied" under the terms of paragraph 10(a) of the Agreement and applicable law. Sonat's good faith is therefore evidenced by the fact that its conduct was consistent with the beliefs about the project expressed by the only individual who has questioned Sonat's motives in terminating the Agreement.

Sonat demonstrated with testimony and documentation the results of its due diligence. Sonat considered these results in reaching its determination that it was dissatisfied. Mr. Wheeler's speculation as to other possible reasons why Sonat did not consummate the deal is insufficient to defeat a summary judgment motion when Mr. Wheeler himself has stated the view that the high cost of clean-up should terminate the deal.

■ The Court concludes that a review of the evidence considered by Sonat under the proper legal standard supports its position that it was not "satisfied" with its due diligence in accordance with paragraph 10(a) of the Agreement. Thus, Sonat did not breach either the explicit terms of the Agreement or its implied duty of good faith. The Court further concludes that Sonat's conduct, which was expressly contemplated by the Agreement, was not wanton, willful, or grossly negligent, nor did it indicate a reckless disregard for Mr. Davis' rights. Based on these conclusions and applying the legal standards set forth herein above, Sonat's motion for summary judgment is hereby granted (Docket # 17).

IT IS SO ORDERED.